CARLOS CASANOVA, Plaintiff-Appellant, v. THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—01—3583

Opinion filed June 30, 2003.

Stanley H. Jakala, of Berwyn, for appellant.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna R. Solomon, and David Graver, Assistant Corporation Counsel, of counsel), for appellees.

JUSTICE HALL delivered the opinion of the court:

Plaintiff-appellant, Carlos Casanova, a former firefighter with the Chicago fire department, appeals from the circuit court's order dismissing his second amended petition to vacate the arbitrator's award. In the arbitration award, the arbitrator found that the City of Chicago (City) had demonstrated just cause for discharging Casanova after he tested positive for alcohol in violation of his "Last Chance Agreement" (LCA). The circuit court dismissed Casanova's second amended petition to vacate the arbitral award on the ground that he had no standing to contest the award. The circuit court also found that the arbitrator did not exceed his authority or violate public policy by finding that the City was not required to give Casanova a urine test to confirm the results of his Breathalyzer tests.

On appeal, Casanova contends that: (1) the LCA is a separate agreement from the collective bargaining agreement (CBA), and therefore the LCA gives him standing, independent of his union, to bring suit to vacate the arbitrator's award; and (2) the arbitrator's finding that the City was not required to perform a urine test to confirm the Breathalyzer test results amounted to a taking of his property interest without due process of law in violation of public policy. For the reasons that follow, we affirm.

## FACTUAL BACKGROUND

On December 29, 1994, Casanova and a codefendant were arrested by the Chicago police department for possession of cocaine. At the time of his arrest, Casanova was employed as a firefighter with the Chicago fire department (CFD) and was a member of the Chicago Fire Fighters Union, Local #2 (Union). As a result of the arrest, the CFD brought disciplinary charges against Casanova seeking his termination. Casanova filed a grievance protesting the threatened discharge. No disciplinary action was taken, however, as the CFD awaited the outcome of the underlying criminal charge.[1]

On September 10, 1997, Casanova, in the presence of a Union

---

[1]The record indicates that in January 1998, in a nonjury proceeding, the criminal court granted Casanova's motion for a directed finding of not guilty, on the ground that the State had failed to show the necessary chain of custody regarding the confiscated narcotics.

representative, signed what is commonly referred to as a "Last Chance Agreement" or "LCA."[2] The LCA provided that the recommended discipline of termination pursuant to General Order 87—008 would be held in abeyance provided Casanova complied with the specific terms set forth in the employee assistance program and subjected himself to random testing for drugs and/or alcohol for a period of one year. Under his LCA, if Casanova tested positive for drugs or alcohol during this one-year period, either on or off duty, he would be subject to immediate discharge. The LCA also provided that Casanova waived any rights he may have had "to contest or challenge any matters arising out of the drug and alcohol screening conducted in this case." The grievance as to the originally sought termination was withdrawn at or about the same time the LCA was executed.

Thereafter, on the morning of September 30, 1997, 20 days after signing the LCA, Casanova underwent a randomly scheduled drug and alcohol test in accordance with the terms of his LCA. In answer to the question as to whether he had taken any medication within the past six hours, Casanova stated that he had taken Tylenol Robitussin cough syrup at about 6 a.m. The CFD then administered two Breathalyzer tests for alcohol. The first test occurred at 9:46 a.m., and the second at 9:59 a.m. Both tests yielded a .04% positive alcohol level.

The CFD discharged Casanova by letter dated November 25, 1997, on the ground that his positive test results for alcohol constituted a violation of his LCA. In response, the Union filed a grievance challenging Casanova's discharge and, in accordance with the provisions of the collective bargaining agreement, submitted the matter to arbitration.

Hearings before arbitrator Edwin H. Benn were held on September 29, 1998, and October 6, 1998. The sole issue at arbitration concerned whether the CFD had just cause for discharging Casanova based on the positive test results for alcohol. The Union argued that the accuracy of the Breathalyzer tests could have been compromised due to Casanova ingesting cough syrup containing alcohol just before the tests were administered. The Union asserted that the positive test results could have been caused by Casanova burping and regurgitating the cough syrup. The Union maintained that the cough syrup could

---

[2]"A last chance agreement is an agreement that usually takes place following an employee incident that calls for discipline. The agreement is between the employee and employer. Essentially, a last chance agreement is a written agreement that the employee will be on probation for a stated amount of time, and that if the employee acts contrary either to the stated standards in the last chance agreement or to standards contained in company policies, then the employee will be fired." *Dow Chemical Co. v. Local No. 564*, 246 F. Supp. 2d 602, 606 n.2 (S.D. Tex. 2002).

have left trace amounts of alcohol in Casanova's teeth and mouth. The Union also argued that since Casanova's absorption of alcohol was slowed by hepatitis, the three tablespoons of cough syrup he had been taking every three to four hours before and on the date the Breathalyzer tests were administered could have caused the positive test results.

In response, counsel for the City maintained that before Casanova took the Breathalyzer tests there was no evidence that he was burping to any extent that would have caused regurgitation of the cough syrup. The City also presented evidence that pursuant to department protocol, the Breathalyzer tests were given in such staggered time periods that any trace amounts of alcohol in Casanova's teeth and mouth would have dissipated by the time the tests were administered.

The City also presented the testimony of Doctor Arthur Prancan, an associate professor of pharmacology at Rush Medical College. Dr. Prancan testified that if Casanova had ingested three tablespoons of cough syrup containing alcohol between 6 a.m. and 8 a.m., this would not have resulted in a measurable concentration of alcohol at the time he underwent the Breathalyzer tests, even taking into account his slowed absorption of alcohol due to hepatitis. Dr. Prancan opined that in order for a person of Casanova's weight (205 pounds) to produce a .04% test result at 9:46 a.m., he would either have to consume 17.75 ounces (2.2 eight-ounce bottles) of cough syrup containing 5% alcohol 20 minutes prior to the test, or consume 55.8 tablespoons (3.5 eight-ounce bottles) of cough syrup at 8 a.m.

The Union countered that in addition to the Breathalyzer tests, the City should have performed a confirmatory test for alcohol on Casanova's urine specimen since he ingested cough syrup containing alcohol before taking the Breathalyzer tests. The City responded that General Order 87—008 did not require urine tests for alcohol but, rather, permitted the use of a Breathalyzer test to detect alcohol.

On January 3, 1999, the arbitrator handed down his award. The arbitrator stated that Casanova had failed to raise the hepatitis matter until the hearing and noted that after Casanova was diagnosed with hepatitis in 1988, he ignored his physician's instructions to abstain from all alcoholic beverages. The arbitrator determined that even accounting for Casanova's impaired absorption of alcohol due to hepatitis, the small dosages of cough syrup he claimed he consumed before taking the Breathalyzer tests did not account for the .04% positive test results. The arbitrator also determined that pursuant to General Order 87—008, the City was not required to perform a confirmatory test for alcohol on Casanova's urine specimen. Accordingly, the arbitrator denied the Union's grievance, finding that the

City had met its burden of proving just cause for discharging Casanova where he tested positive for alcohol in violation of his LCA. The Union did not challenge the arbitrator's decision.

On April 5, 1999, Casanova, represented by private counsel, filed a petition in circuit court to vacate the arbitral award. In the petition, counsel argued that the arbitrator exceeded his authority by finding that a confirmatory urine test for alcohol was not required before Casanova could be discharged. Counsel asserted that Casanova had a property interest in his employment and that the arbitrator's denial of Casanova's grievance without requiring the City to perform a urine test to confirm the Breathalyzer tests amounted to a taking of this property interest without due process of law in violation of public policy. Counsel also argued that the Union breached its duty of fair representation by failing to file a petition to vacate the arbitral award.

On May 7, 1999, pursuant to section 2—615 and section 2—619 of the Code of Civil Procedure (Code) (735 ILCS 5/2—615, 2—619 (West 1994)), the City filed its motion to dismiss Casanova's petition to vacate the arbitral award. The City argued that Casanova's petition should be dismissed because it was untimely filed. The City also argued that Casanova lacked standing to bring a petition to vacate the arbitral award unless he alleged and proved that his Union breached its duty of fair representation. In addition, the City claimed that even if Casanova had standing to contest the award, he failed to allege facts sufficient to state a claim that the Union committed any unfair labor practice. The City further argued that the arbitrator did not exceed his authority because there is no public policy requiring the use of a confirmatory urine test rather than a Breathalyzer test to establish the presence of alcohol.

On September 8, 1999, while Casanova's petition to vacate the arbitral award was pending in the circuit court, counsel for Casanova filed an unfair labor practice charge with the Illinois Labor Relations Board (Labor Board), alleging that the Union had breached its statutory duty of fair representation owed Casanova under the Illinois Public Labor Relations Act (Labor Act) (5 ILCS 315/1 et seq. (West 1996)). In the charge, counsel maintained that in light of the 90-day limitations period for filing a petition to vacate an arbitral award, the Union's conduct in waiting until May 10, 1999, to inform Casanova that the Union would not be filing a petition to vacate on his behalf amounted to unfair representation. Counsel sought a declaration requiring the Union to proceed with a petition to vacate the arbitration award, reinstatement of Casanova and any other relief provided by the Labor Act.

On September 10, 1999, the circuit court heard oral arguments on

Casanova's petition to vacate the arbitral award. The record shows that this hearing was the first time the circuit court was informed that counsel for Casanova had filed a charge with the Labor Board. The circuit court was also informed that the Labor Board had not yet made a determination. Upon receiving this information, the circuit court stated that these revelations altered its view on the standing issue.

At the court hearing, the City argued that in order for Casanova to have standing to contest the arbitration award, he would have to submit his claim in the form of an unfair labor charge with the Labor Board, which the City claimed had exclusive jurisdiction. In addition, the City argued that the arbitrator's finding that a confirmatory urine test for alcohol was not required did not offend public policy, since Breathalyzer tests were commonly used in criminal proceedings such as driving under the influence (DUI) of alcohol. The City further argued that a Breathalyzer test was noninvasive and it was reasonably related to the governmental interest of insuring that firefighters were not intoxicated while on duty.

After arguments were concluded, the circuit court denied the City's motion to dismiss on the ground of standing, and instead held proceedings over until completion of the Labor Board's investigation of Casanova's charge against the Union. On the issue of public policy, the circuit court concluded that it could not, at that time, determine whether the arbitrator's award violated a defined and dominant public policy. The circuit court, therefore, gave Casanova permission to file an amended petition containing facts sufficient to establish that the arbitrator's award violated a well-defined and dominant public policy.

Casanova filed an amended petition with the circuit court on May 8, 2000. On October 6, 2000, the Labor Board issued its decision dismissing Casanova's unfair labor charge against the Union. Casanova appealed the Labor Board's decision directly to this court. *Casanova v. Illinois Labor Relations Board Local Panel*, No. 1—01—0313 (2001) (unpublished order under Supreme Court Rule 23).

On December 13, 2000, Casanova filed a second amended petition to vacate the arbitral award in the circuit court. The circuit court dismissed Casanova's second amended petition on September 6, 2001. The circuit court determined that the CBA did not give Casanova standing to contest the arbitral award and since the LCA was not an independent agreement, but instead was subject to the CBA, the LCA also did not give him standing to contest the award. The circuit court also concluded that there was no public policy guaranteeing a confirmatory urine test and, therefore, the arbitrator did not exceed his authority by finding that a confirmatory urine test for alcohol was

not required before Casanova could be discharged. Casanova filed his notice appealing the circuit court's order on September 25, 2001.

Meanwhile, on December 31, 2001, this court entered a Rule 23 order rejecting Casanova's claim that the Labor Board erred by dismissing his unfair representation charge against the Union. *Casanova v. Illinois Labor Relations Board Local Panel*, No. 1—01— 0313 (2001) (unpublished order under Supreme Court Rule 23). On May 30, 2002, our supreme court denied Casanova's petition for leave to appeal the Rule 23 order.

## ANALYSIS

### Standard of Review

■ The circuit court's order dismissing Casanova's second amended petition under section 2—615 and section 2—619 involves questions of law and is therefore reviewed *de novo*. *R-Five, Inc. v. Shadeco, Inc.*, 305 Ill. App. 3d 635, 639, 712 N.E.2d 913 (1999).

### I. Last Chance Agreement

Casanova first contends that the LCA gives him a right, independent of his union, to contest the arbitral award. He asserts that the LCA is a separate agreement from the CBA and, therefore, the LCA gives him standing to bring suit to vacate the arbitrator's award.

The City responds that the LCA does not give Casanova standing to contest the arbitrator's award because the LCA is not an independent agreement but, rather, is subject to the CBA between the City and the Union. The City maintains that the underlying arbitration was authorized by the CBA and not the LCA, which contains no arbitration clause. The City argues that the arbitration clause giving rise to the arbitral proceedings is found only in the CBA, and therefore, only parties to the CBA have standing to challenge an arbitration award. The City contends that since Casanova is not a party to the CBA, he has no standing to bring suit to vacate the arbitration award. We agree with the City.

Federal courts addressing this issue have determined that last chance agreements are not independent of the collective bargaining agreement, but instead should be treated as supplements to the collective bargaining agreement for preemption purposes because the last chance agreement can only be effective as part of the larger collective bargaining agreement[3]. See, *e.g.*, *Tootsie Roll Industries, Inc. v. Local Union No. 1*, 832 F.2d 81, 83-85 (7th Cir. 1987) (treating last chance

---

[3]Holding that section 301(a) of the Labor Management Relations Act (LMRA) of 1947 (29 U.S.C. § 185(a) (2000)) preempts state-law claims for

agreement as if it were a collective bargaining agreement); *Bakers Union Factory No. 326 v. ITT Continental Baking Co.*, 749 F.2d 350, 354, 356 (6th Cir. 1984) (concluding that the collective bargaining agreement provides the means by which the parties may negotiate a last chance agreement); *International Union of Operating Engineers, Local 351 v. Cooper Natural Resources, Inc.*, 163 F.3d 916, 919 (5th Cir. 1999) (stating that when the company and union entered into the LCA reducing an employee's punishment for failing a drug test, the parties "formed a binding contract pursuant to the CBA" and that the "LCA must be thought of as a supplement to the CBA")[4].

■ Similar to the federal courts' interpretation of the matter, the LCA in this case is not a separate agreement from the CBA. The collective bargaining agreement provided the framework for Casanova's LCA. For example, under the LCA, in lieu of being terminated, Casanova was given the opportunity to address his alleged alcohol and/or drug dependency problems by participating in the fire department's employee assistance program referenced in section B1, article VI, of the CBA. This section of the CBA states in relevant part that "[t]he Department has historically maintained an Employee Assistance Program to assist employees who may suffer from alcoholism, drug dependency, or other illnesses which should be treated." This section also indicates that nonprobationary employees are entitled to enter into last chance agreements. Thus, it is clear that the City's alcohol and substance abuse policy relating to firefighters was the result of collective bargaining between the City and the Union. Without the protections contained in the CBA, Casanova would not have had the opportunity to enter into a last chance agreement to save his job.

Therefore, since Casanova's LCA is technically a supplement to the collective bargaining agreement and the arbitration clause giving rise to the arbitral proceedings is found only in the CBA, the only way that Casanova would have standing to contest the arbitral award

---

breach of disciplinary agreements such as last chance agreements, since these agreements are founded on rights created by collective bargaining agreements negotiated between employers and labor organizations representing employees in industries affecting commerce. *Thomas v. LTV Corp.*, 39 F.3d 611, 618 (5th Cir. 1994) (concluding that attendance probation agreement technically qualified as a collective bargaining agreement because it was a collectively bargained-for instrument, manifesting a disciplinary action taken by the corporation for an employee's poor work attendance).

[4]Federal court decisions are not binding on Illinois courts, but may be considered persuasive authority. *People ex rel. Ryan v. World Church of the Creator*, 198 Ill. 2d 115, 127, 760 N.E.2d 953 (2001).

would be if he were a party to the collective bargaining agreement or he was able to show that the Union breached its duty of fair representation.

Casanova is not a party to the CBA and accordingly he does not have standing to bring suit to vacate the arbitral award on this basis. Our supreme court has determined that under section 8 and section 16 of the Labor Act (5 ILCS 315/8, 16 (West 1996)), only parties to a collective bargaining agreement, such as bargaining representatives and employers, may bring suit in a circuit court to vacate an arbitral award. *Stahulak v. City of Chicago*, 184 Ill. 2d 176, 180, 703 N.E.2d 44 (1998). Section 16 of the Labor Act provides:

> "After the exhaustion of any arbitration mandated by this Act or any procedures mandated by a collective bargaining agreement, suits for violation of agreements *** between a public employer and a labor organization representing public employees may be brought by the parties to such agreement in the circuit court in the county in which the public employer transacts business or has its principal office." 5 ILCS 315/16 (West 1996).

Section 8 of the Labor Act provides in relevant part that "[t]he grievance and arbitration provisions of any collective bargaining agreement shall be subject to the Illinois 'Uniform Arbitration Act.' " 5 ILCS 315/8 (West 1996). And section 12(a) of the Uniform Arbitration Act provides that "[u]pon application of a party," the circuit court shall vacate an award under certain enumerated circumstances. 710 ILCS 5/12(a)(1) through (a)(5) (West 1994).

The supreme court has held that pursuant to sections 8 and 16 of the Labor Act, section 12(a) of the Uniform Arbitration Act permits arbitral awards to be challenged only by the parties to the collective bargaining agreement and not individual employees. *Stahulak*, 184 Ill. 2d at 180. In *Stahulak*, the supreme court concluded that in exchange for the benefits provided by the collective bargaining agreement, individual employees gave up their rights to bargain with the City. *Stahulak*, 184 Ill. 2d at 184. The supreme court went on to state that if an individual unionized employee was allowed to freely seek judicial review of an arbitral award, " 'the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiations.' " *Stahulak*, 184 Ill. 2d at 184, quoting *Vaca v. Sipes*, 386 U.S. 171, 191, 17 L. Ed. 2d 842, 858, 87 S. Ct. 903, 917 (1967). Consequently, the supreme court has held that "individual employees represented by a union should only be allowed to seek judicial review of an arbitration award if they can show that their union breached its duty of fair representation." *Stahulak*, 184 Ill. 2d at 184.

In the instant case, there are two reasons why Casanova cannot show that the Union breached its duty of fair representation. First, Casanova's petition fails to allege that the Union breached its duty of fair representation. And second and more important, this issue was decided adversely to Casanova by the Labor Board, which found that the Union did not breach its duty of fair representation to Casanova when it declined to bring a challenge to the arbitral award in the circuit court. The Labor Board's decision was upheld by this court in *Casanova v. Illinois Labor Relations Board Local Panel*, No. 1—01—0313 (2001) (unpublished under Supreme Court Rule 23), and thereafter, Casanova's petition for leave to appeal the Rule 23 order to the supreme court was denied.

Consequently, the City contends that under the doctrine of collateral estoppel, the Labor Board's decision bars Casanova from relitigating the unfair labor claim in this appeal. We agree with the City. The doctrine of collateral estoppel, also known as issue preclusion, bars a claim when: (1) the issue decided in the first proceeding is identical with the one presented in the current action; (2) there was a final judgment on the merits in the prior adjudication; and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication. *Terry v. Watts Copy Systems, Inc.*, 329 Ill. App. 3d 382, 389, 768 N.E.2d 789 (2002). In this case, all the requirements for application of collateral estoppel have been satisfied. First, the proceedings before the Labor Board were judicial in nature, resulting in a written decision. See *Marco v. Doherty*, 276 Ill. App. 3d 121, 124-25, 657 N.E.2d 1165 (1995) (concluding that administrative decisions have collateral estoppel effect where the department's determination is made in proceedings which are adjudicatory, judicial or quasi-judicial in nature). Second, the issue regarding the unfair labor claim decided before the Labor Board is identical to the issue presented in this appeal. Third, the Labor Board reached a final decision on the issue, which was subsequently affirmed by this court. And fourth, Casanova, against whom collateral estoppel is being asserted, was a party in the earlier adjudication and was represented by counsel. Consequently, Casanova cannot now relitigate the unfair labor claim in this appeal and therefore he does not have standing to bring suit to vacate the arbitral award.

■ Alternatively, the City contends that the doctrines of waiver and estoppel prevent Casanova from claiming that his LCA gave him contract rights independent of the CBA. Specifically, the City maintains that Casanova waived any contract rights he may have had under the LCA, by failing to assert these rights before the Union took up his cause under the CBA's grievance procedure or during the

arbitration. The City contends that if Casanova wanted to assert independent contract rights under his LCA, he should have done so at the beginning of the dispute by taking his grievance directly to the City and if unsatisfied, filing an action alleging breach of contract in the circuit court. The City argues that Casanova's failure to take these measures gives rise to estoppel. We must reject the City's arguments on this issue.

Even though Casanova's LCA is technically a supplement to the collective bargaining agreement, the two agreements should not be construed as one contract for the purpose of determining whether Casanova waived his rights under the LCA or whether he should be estopped from arguing that the LCA is a separate agreement from the CBA. The collective bargaining agreement governs the employer-employee relationship and resulted from negotiations between the City and the Union. In contrast, the LCA was the result of negotiations between Casanova and personnel from the Chicago fire department such as employee assistance counselors and disciplinary officers. In signing the LCA, Casanova entered into a new contractual relationship that significantly altered his rights under the existing collective bargaining agreement. Casanova was discharged for violating the terms of his LCA, not the collective bargaining agreement. Accordingly, the issues relative to Casanova's LCA cannot be precluded by the doctrines of equitable estoppel or waiver.

■ Casanova next contends that he had a property interest in his employment and that the arbitrator's denial of his grievance without requiring the City to perform a urine test to confirm the Breathalyzer test results amounted to a taking of this property interest without due process in violation of public policy. The due process clause of the fourteenth amendment forbids a state from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend XIV, § 1. The constitutional guarantee of due process encompasses both procedural and substantive rights. *In re Perona*, 294 Ill. App. 3d 755, 690 N.E.2d 1058 (1998) (stating that procedural due process governs methods by which a protected interest may be deprived, while substantive due process imposes absolute limits on the state's ability to act without regard to applicable procedural protections). In the present case, Casanova maintains that the failure to have a confirmatory urine test violated his procedural due process rights.

■ To sustain a procedural due process claim, Casanova must show: (1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process. *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201, 1206 (7th Cir. 1993). In the present case, the LCA provided Casanova with a limited, but enforceable property

interest in his continued employment with the Chicago Fire Department. See, *e.g.*, *Medellin v. Chicago Transit Authority*, No. 93 C 6091 (N.D. Ill. 1996) (concluding that last chance agreement provided a Chicago Transit Authority employee with a limited but enforceable property interest in his continued employment); *Prato v. Vallas*, 331 Ill. App. 3d 852, 867-68, 771 N.E.2d 1053 (2002) (noting that a "public employee who may be terminated only for cause has a property interest in his employment within the meaning of the due process guarantees of the United States and Illinois Constitutions"). Casanova's discharge by the Chicago fire department after testing positive for alcohol constituted a deprivation of his property interest. *Medellin*, slip op. at ___. However, the factual circumstances in this case do not indicate that Casanova was denied due process of law.

■ Due process is a flexible concept whose procedures depend upon the particular circumstances of each case. *Wendl v. Moline Police Pension Board*, 96 Ill. App. 3d 482, 486, 421 N.E.2d 584 (1981). In general, due process requires notice of the charges and an opportunity for a hearing appropriate to the nature and gravity of the charges. *Prato*, 331 Ill. App. 3d at 868. To determine whether due process is satisfied in a particular case, this court must apply the three-part test articulated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903 (1976). This test requires the court to balance:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335, 47 L. Ed. 2d at 33, 96 S. Ct. at 903.

■ In essence, Casanova's contention is based upon the second factor. Casanova basically argues that the risk of erroneous deprivation of his property interest was high, because the medication he was taking contained alcohol and therefore the need for accuracy and reliability required that a confirmatory urine test be given to validate the accuracy of the Breathalyzer test results. There is some logic to Casanova's argument. General Order 87—008 allows for a second confirmatory test for drugs, but not for alcohol. Such a procedural safeguard against mistaken drug test results suggests that under certain circumstances there might be value in having confirmatory tests for alcohol. See, *e.g.*, *People v. Orth*, 124 Ill. 2d 326, 336, 530 N.E.2d 210 (1988) (noting that while Breathalyzer tests are generally

valid, they are not foolproof). In many instances, in addition to taking a Breathalyzer test, an employee also gives a urine specimen, so it is debatable whether under such circumstances an employer's interest in managerial efficiency would outweigh the value of a confirmatory urine test for alcohol where the employee is taking a prescribed medication containing alcohol. Nonetheless, the City and Union have agreed that Breathalyzer tests should be the method for testing alcohol levels.

Courts have determined that the risk of error is low where a termination decision turns squarely on the results of routine, standardized medical and clinical procedures conducted by qualified, unbiased healthcare specialists. *Buttitta*, 9 F.3d at 1206, citing *Mathews*, 424 U.S. at 344, 47 L. Ed. 2d at 38, 96 S. Ct. at 907. In the present case, there was no evidence presented that the Breathalyzer machine was working improperly or that the tests were improperly administered. See, *e.g., People v. Orth*, 124 Ill. 2d 326, 340 (1988) (concluding that in DUI cases, the foundational requirements for admission of Breathalyzer results include evidence that: (1) the tests were performed according to the uniform standard adopted by the Illinois Department of Public Health; (2) the operator administering the tests was certified by the Department; (3) the machine used was a model approved by the Department, was tested regularly for accuracy, and was working properly; (4) the motorist was observed for the requisite 20 minutes prior to the test and, during this period, the motorist did not smoke, regurgitate, or drink; and (5) the results appearing on the printout sheet can be identified as the tests given to the motorist). The record indicates the Breathalyzer tests were conducted by running two "blanks" which yielded results of .00%, followed by a blow from Casanova at 9:46 a.m. yielding a result of .04% and a blow at 9:59 a.m., which also yielded a result of .04% alcohol level. In addition, uncontroverted evidence was presented that even accounting for Casanova's impaired absorption of alcohol due to hepatitis, the small dosages of cough syrup he claimed he consumed before taking the Breathalyzer tests would not have accounted for the .04% positive test results. On these facts, we cannot say that the City's failure to give Casanova a urine test to confirm the results of his Breathalyzer tests violated his procedural due process rights.

■ Despite the Breathalyzer test results, Casanova contends that "public policy" requires the use of a confirmatory urine test. We must reject Casanova's contention. "Courts have crafted a public policy exception to vacate arbitral awards which otherwise derive their essence from a collective-bargaining agreement." *American Federation of State, County & Municipal Employees v. Department of Central*

*Management Services*, 173 Ill. 2d 299, 306, 671 N.E.2d 668 (1996). In order to vacate an arbitral award on public policy grounds, the contract, *as interpreted* by the arbitrator, must violate some explicit public policy. *American Federation*, 173 Ill. 2d at 307. The public policy exception is narrow and is invoked only when a violation of public policy is clearly shown. *American Federation*, 173 Ill. 2d at 307. In addition, the public policy must be " 'well-defined and dominant' and ascertainable 'by reference to the laws and legal precedents and not from generalized considerations of supposed public interests.' " *American Federation*, 173 Ill. 2d at 307, quoting *W.R. Grace & Co. v. Local Union No. 759*, 461 U.S. 757, 766, 76 L. Ed. 2d 298, 307, 103 S. Ct. 2177, 2183 (1983).

The application of the public policy exception requires a two-step analysis. The threshold question is whether a well-defined and dominant public policy can be identified. If so, the court must then determine whether the arbitrator's award, as reflected in his interpretation of the agreement, violated the public policy. *American Federation*, 173 Ill. 2d at 307-08. Casanova contends that General Order 87—008 violates public policy because it does not require a urine test to confirm the results of a Breathalyzer test. However, Casanova has failed to identify any law or judicial decision identifying a well-defined and dominant public policy requiring the City to perform a urine test to confirm Breathalyzer test results. There is no public policy against the use of Breathalyzer test results. As previously mentioned, the City and Union have agreed that the Breathalyzer test is the preferred method for measuring alcohol levels.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SOUTH, P.J., and WOLFSON, J., concur.