THIRD DIVISION

June 9, 2004

No. 1-03-1128

CHARMAINE GARRIDO,                   ) Appeal from the 

) Circuit Court of

Petitioner-Appellant, ) Cook County.

v. )

) 

THE COOK COUNTY SHERIFF'S MERIT BOARD, )
 

James P. Nally, Michael D. Carey, Arthur R. Waddy, ) 

Jerome F. Marconi, Jr., Marynell O. Greer, Robert F. ) 

Hogan, Donald J. Storino, George P. Cahill, and Byron ) 

Brazier; SHERIFF OF COOK COUNTY, MICHAEL F. ) Honorable

SHEAHAN; and the EXECUTIVE DIRECTOR, ) John K. Madden,

EDWARD WODNICKI, )
 Judge Presiding.

)

Respondents-Appellees.
 )

JUSTICE SOUTH delivered the opinion of the court:

This appeal arises from an order of the circuit court of Cook County which denied a petition for administrative review of a decision of the Cook County Sheriff's Merit Board (Merit Board) to discharge petitioner, Charmaine Garrido, after it found that she was in violation of the sheriff’s office drug-free workplace policy

BACKGROUND 

Petitioner was hired by the Cook County sheriff's office (Sheriff) in January 1990 and was continuously employed there as a deputy sheriff until her termination in January 2001.  Since April 26, 1993, the sheriff's office has had in effect a drug-free workplace policy.  General Order No. 1002 (Sheriff's Drug-Free Workplace Policy) provides, in relevant part:

" I.  Purpose  

The purpose of this order is to disseminate and implement the Sheriff's Drug-Free Workplace Policy (Appendix A), and the Mandatory Guidelines for Drug Testing (Appendix B), for all sworn Department Personnel.

II.  Policy

A.  It is the policy of this Department to take all reasonable measures to provide and maintain a work environment free of unlawful use of drugs or controlled substances.

B. The unlawful involvement with drugs; the presence in an employee's system of drugs or controlled substances, or their metabolites, the use of cannabis or non-prescribed controlled substances by sworn personnel, at any time, while on or off-duty are strictly prohibited.

III. Definitions 

***

B. 'Drugs or controlled substances' include, but are not limited to, the following substances and their respective metabolites: 

*** 

(2) Controlled substance as defined in Chapter 56½, Section 1100, et seq., Illinois Revised Statutes, or as amended.

IV. Responsibilities [of] Sworn Personnel

It is the responsibility of all sworn Department personnel to acquaint themselves with, and abide fully by, the provisions of the Sheriff's Drug-Free Workplace Police (Appendix A) and the Mandatory Guidelines for Drug Testing (Appendix B).

*** 

VI. Disciplinary Action 

Violation of this policy, substantiated by a confirmed positive drug test, will result in disciplinary action leading to *** the referral of charges to the Merit Board, by the Sheriff or his designee, seeking the discharge of a sworn merit employee." 

An employee found in violation of General Order No. 1002, substantiated by a confirmed positive test for an illegal substance or the metabolites thereof, is referred to the Merit Board for the purpose of seeking his or her discharge.  All parties agree that this is a zero-tolerance policy. 

On October 5, 2000, as part of the drug-free workplace policy, petitioner was randomly selected by computer to undergo drug testing.  Following the October 5 test, the sheriff's office was notified by Quest Diagnostic Laboratory, which performed the test and analysis, that petitioner’s urine sample had tested positive for the presence of cocaine metabolites.  
After being informed of those positive test results, petitioner requested that the specimen be retested by a different laboratory.  That laboratory, the University of Missouri-Columbia Toxicology Laboratory, confirmed the original findings of Quest. 

On January 16, 2001, the sheriff's office filed a complaint with the Merit Board, pursuant to section 3-7012 of the Counties Code (55 ILCS 5/3-7012 (West 2000)) maintaining that petitioner had violated the sheriff’s office drug-free workplace policy, and that on proof of the charge she should be dismissed for cause. 

A hearing on the complaint was conducted before the Merit Board.  Prior to the evidentiary portion of the hearing, the parties entered into a number of stipulations: (1) that petitioner was appropriately selected for a random drug test, that the test was properly administered, and the quantitative amount was 307 nanograms per milliliter; (2) that petitioner asked for the specimen to be retested by the University of Missouri-Columbia Toxicology Laboratory, which reconfirmed the positive findings for cocaine metabolites; (3) that the chain of custody was proper and intact throughout the procedure; and (4) that General Order No. 1002 and the rules and regulations of the Cook County Sheriff’s Merit Board, article X, paragraph B, section 3, were in effect during petitioner’s employment with the Sheriff.  

William Cunningham, director of the sheriff's office drug test unit (DTU), was the first witness to testify on behalf of the Sheriff.  As the director, he was responsible for overseeing the drug testing of all sheriff's office employees.  On October 5, 2000, petitioner reported to the DTU after being notified that she had been randomly selected for drug testing.  The DTU sent her urine sample to Quest, where the sheriff's office specimens are regularly tested for 10 different types of drugs, including cocaine.  Quest notified Cunningham that petitioner’s sample had come back with a positive reading of 307 nanograms per milliliter for cocaine metabolites, specifically benzoylecgonine.  Under the guidelines that apply to the sheriff's office drug testing, the minimum number of nanograms for a positive test result for the original "emissary test" is 300 nanograms.  If the sample tests 300 nanograms or above, it is then returned for a confirmatory test where the cutoff point is 150 nanograms for a positive result.  The sheriff's office notified petitioner of the positive drug test, and she elected to have the sample retested.  Once again, it came back positive for the presence of cocaine metabolites. 

Cunningham testified that all sworn officers, including petitioner, are notified in writing of the sheriff's office policy on drugs and are required to adhere to it.  He also identified a notice sent in 1994 to all sheriff's office employees regarding the effect of certain herbal medicines.  The notice stated that all employees are responsible for insuring that any herbal medicines or other nonprescription or over-the-counter special remedies do not contain a controlled or illegal substance. 

Sharon Diver
, the next witness to testify, is a technician in the DTU who was assigned to work with petitioner on October 5, 2000.  Prior to collecting the urine sample, Diver went through the drug screen specimen affidavit with petitioner and asked her what type of prescribed or over-the-counter medications she was taking.  Petitioner only listed two prescription medications.  Diver recalled petitioner was not feeling well and that she gave her a cough drop. 

The Sheriff rested his case in chief.

John Garrido, petitioner’s husband, testified that he is a Chicago police officer and has worked in the organized crime division, narcotics section, for the past 15 years.  In August 1999, he and petitioner traveled to Huancayo, Peru, to adopt a baby.  After they left Huancayo, the infant, then seven months old, became ill, so they took her to the American Hospital in Lima, Peru, where a doctor gave her a watered down tea to soothe her upset stomach.  The doctor recommended Mate de Coca tea for the baby and gave them a few bags.  Garrido was unfamiliar with the tea and jokingly asked the doctor whether the word "coca" meant it contained cocaine.  The doctor assured him that the tea had been "de-cocainized [sic]."  Garrido drank some of the tea himself during the family's month-long stay in Peru, and he and petitioner purchased about two or three boxes from a local Peruvian supermarket which they brought back with them to the United States.  He recalled that petitioner drank the tea from time to time whenever she became ill. 

In March 2001, after petitioner failed her drug test, Garrido returned to Peru, purchased additional boxes of Mate de Coca, and photographed them as they appeared for sale on the shelves of the local supermarkets.  He brought these tea boxes back to the United States in connection with this case and ordered some more of it over the Internet in order to demonstrate how easily it can be purchased even though it is illegal in the United States due to its cocaine content.  He further testified that the Mate de Coca tea cleared United States Customs upon his return, although he never believed the items would have been seized because they were in such small quantities. 

Petitioner was the next witness to testify and corroborated her husband's testimony that in the summer of 1999, they purchased Mate de Coca tea in Peru after a doctor recommended it for their newly adopted daughter when she became ill.  Petitioner tried the tea in Peru and continued to drink it while she was back at home whenever she would become sick.  In early October of 2000, she caught the flu and consumed a significant amount of the tea while recuperating at home.  When she returned to work on October 5, 2000, she was informed that she had been selected for a random drug test.  Over the course of her employment, she had been selected for several such tests, which she had passed, and was familiar with the procedure.  When she filled out the pretesting affidavit, it did not occur to her to include the Mate de Coca tea.  Petitioner  testified that she never knowingly or intentionally ingested cocaine and was in "disbelief" when  notified that she had failed the drug test.  

Within a couple of days of receiving the results, she made a list of everything she had consumed in the days prior to the test and eventually suspected the Mate de Coca tea.  She sent some of it to Dr. Anthony Wu for a chemical analysis.  She also provided Dr. Wu with a hair sample for an alternative drug analysis and ordered Mate de Coca tea over the Internet in order to demonstrate that it could be sent to the United States.  Petitioner testified that she had read the sheriff's office drug-free workplace policy and knew that it was zero-tolerance. 

Numerous colleagues testified on petitioner’s behalf as to her reputation in the police community for truth and veracity, and that she had never been observed or suspected of being under the influence of alcohol or any other mind-altering drug.  

Uday Masder, a computer operator and programmer at KK Bio-Science laboratory in Chicago, testified that he helps collect hair samples for drug analysis.  On October 12, 2000, petitioner brought a prescription to KK Bio-Science for a hair sample to be cut for drug testing.  Masder took the hair sample that day and sent it for analysis to the United States Drug Testing Laboratory (DTL).

Douglas Lewis, president of DTL, testified that DTL is in the business of testing alternative specimens for the presence of drugs, and that alternative specimens include anything other than urine.  In October 2000, DTL received petitioner’s hair specimen from KK Bio-Science, and it tested negative for the presence of drugs.  He testified that while a negative hair analysis does not refute a positive urine test, it does measure a longer time frame for drug use than urine.  While hair provides a cumulative record of approximately three months, a urine sample shows a history of about three days.  Hair is a good receptacle and storage place for organic bases, which means that cocaine sticks to hair very well.  Benzoylecgonine, the metabolite of cocaine, will also stick to hair but not as easily as the parent, cocaine.  According to Lewis, "it requires more benzoylecgonine in your blood to get into your sweat which will [then] contaminate the hair."   Based upon the negative test results of petitioner’s hair specimen, Lewis opined that she was not a chronic user or abuser of drugs. 

Dr. Anthony Wu, a forensic toxicologist at the ACL laboratory, testified that petitioner contacted him for the first time in November 2000, and he agreed to analyze the contents of some tea bags for her.  She mailed two tea bags to him which were labeled "Mate de Coca/Zurit" and "Mate de Coca/Delisse."  While it was his understanding that petitioner had brought the tea back from South America, he had no personal knowledge of their origination.  A lab technician under Dr. Wu's supervision analyzed the contents of each bag and discovered that they contained cocaine, although an analysis of the quantitative amount of cocaine contained in each bag was not performed.   

According to Dr. Wu, a positive screen of 307 nanograms per milliliter of cocaine metabolites is a "very, very small amount," and he would expect "about 100 [or] a thousand times" higher amount in a user or abuser of cocaine.  In June 2001, he received another package from petitioner and her husband containing Mate de Coca tea.  According to Dr. Wu, he could tell that the package originated from "a foreign country" because it had a green customs declaration form on it.  A lab technician under his supervision analyzed the contents of the tea and found that it contained cocaine.  Dr. Wu testified that if anyone consumed this tea, he or she would test positive for cocaine above the cutoff point of 150 nanograms per milliliter, and that there was sufficient cocaine in one tea bag to register a positive reading of 307 nanograms per milliliter.  He did not believe that a person would feel the effects of the cocaine by drinking the tea.  He did concede, however, that he had no way of knowing whether petitioner tested positive for cocaine metabolites by drinking this tea.  

Dr. Jeorg Pirl, the chief of toxicology and metabolic diseases for the Illinois Department of Public Health, also testified on behalf of petitioner as an expert witness in his private capacity.  He explained that cocaine is a chemically unstable substance which breaks down into benzoylecgonine, a metabolite of cocaine.  He further testified that cocaine is rapidly destroyed in the process of brewing or boiling the tea so that "the probability that you get any measurable cocaine into your system is basically almost zero."  However, if a urine test were conducted within 24 hours of ingesting the tea, a positive result would occur due to the presence of a sufficient amount of benzoylecgonine.  Dr. Pirl opined that the amount of cocaine metabolites found in petitioner’s system was consistent with ingesting the Mate de Coca tea, although he conceded that he had no personal knowledge as to how the substance got into her system. 

Petitioner also introduced a number of exhibits in support of her case, including her child’s adoption papers showing that she was adopted in Peru, copies of the tea boxes, pictures of the tea as it appeared on the shelves in the Peruvian supermarkets, and the lab results from the hair analysis.   

Petitioner rested.

 In rebuttal, the Sheriff called M.P. George, the director of operations for Quest Laboratory.  George has worked in the field of toxicology for 23 years and is familiar with tea bags containing coca leaves.  According to George, Mate de Coca tea is illegal in the United States because its leaves contain cocaine, making it a controlled substance.  George also testified that any amount of cocaine in the body would cause an individual to feel its effects, and that brewing or boiling the tea would not cause the cocaine to be broken down.  However, he admitted that those effects would only be "a little higher than caffeinated tea."   He further testified that, based upon petitioner’s drug test, there was no way anyone could determine how much cocaine she had ingested.  While he acknowledged that 307 nanograms per milliliter was a small amount, it only represented the amount that was in petitioner's system at the time of the test.  Finally, he testified that a negative hair result does not refute a positive urine test, and that recent cocaine use would not show up in a hair analysis because it only examines long-term drug use. 

After the hearing, the Merit Board unanimously concluded that petitioner had violated General Order No. 1002, and article X, paragraph B, section 3, of the Merit Board's rules and regulations.   The Merit Board's order stated in pertinent part:

"[1.] At the time [petitioner] appeared to produce her sample to the drug testing unit, ***  [she] had shown signs of being ill.

[2.] [Petitioner] testified that she had recently been sick and had ingested tea to alleviate her symptoms.  The tea *** was purchased in Peru. 

[3.] The evidence established that [petitioner] and her husband had traveled to Peru to adopt a child and purchased Mate de Coca tea from a supermarket in Peru.  The evidence established that the tea was available through the [I]nternet as well as on store shelves at the supermarket in Peru.

[4.]  The evidence established that the tea purchased by [petitioner] contained a controlled substance prohibited by the Illinois Controlled Substance Act.  According to the scientific evidence, the controlled substance would have been broken down by the boiling of the tea but would still produce a positive drug screen as cocaine metabolites would still be present.

[5.]  The evidence established that the amount of cocaine metabolites contained in [petitioner's] urine sample was very small, although it exceeded the threshold established under testing procedures for a positive result, and further scientific testing did not indicate that [petitioner] was a chronic user or abuser of illegal drugs. The amount of cocaine metabolites found in [petitioner's] system was consistent with consuming the Mate de Coca tea from the tea bag produced by the [petitioner].

***

[7.] On April 25, 1994, the Sheriff's Office *** distributed a memorandum which warned employees of the risks of consuming herbal remedies.  Specifically, the memorandum stated, in part:

'All employees are responsible for insuring that any of these herbal medicines or any other non-prescription or over-the-counter special remedies do not contain any controlled or illegal substances.  All employees should check with their physician before taking any medications. *** Any employee testing positive for illegal drugs or controlled substances will be held accountable under the Sheriff's Drug Free Workplace policy.' "     

Petitioner was dismissed for cause, effective January 16, 2002, and subsequently filed a complaint in the trial court for administrative review of the Merit Board's decision.  On March 28, 2003, the trial court affirmed the Merit Board's decision by denying petitioner’s request, and this appeal ensued.   

ANALYSIS

Petitioner argues that
 the sheriff's office zero-tolerance drug policy violated her constitutional right to due process, and that the drug-free policy was constitutionally infirm due to the fact that the Merit Board dismissed her for cause, thereby taking her property interest in her continued employment as a deputy sheriff, even though it found that her uncontraverted explanation for the positive drug screen was supported by the evidence.  The State responds that   petitioner tested positive for drugs, which was all that was needed to be proven, and that her "continued employment would be detrimental to the discipline and efficiency" of the sheriff's office. 

We apply 
de novo
 review to a party's constitutional challenge to a statute or rule.  
Mefford v. White
, 331 Ill. App. 3d 167, 173 (2002), citing 
In re R.C.
, 195 Ill. 2d 291, 296 (2001). The "party
 challenging a statute or rule has the burden of 'clearly establish[ing]' " that it is unconstitutional.  
Mefford
, 331 Ill. App. 3d at 173
, quoting 
Burger v. Lutheran General Hospital
, 198 Ill. 2d 21, 31 (2001). 

The due process clause protects " 'interests that a person has already acquired in specific benefits.' " (Emphasis omitted.)  
Polyvend, Inc. v. Puckorius
, 77 Ill. 2d 287, 294 (1979), quoting 
Board of Regents v. Roth
, 408 U.S. 564, 576, 33 L. Ed. 2d 548, 560, 92 S. Ct. 2701, 2708 (1972).  As a public employee who could only be terminated for cause, petitioner enjoyed a property interest in her continued employment as a deputy sheriff within the meaning of the due process guarantees of the United States and Illinois Constitutions.  
Prato v. Vallas
, 331 Ill. App. 3d 852, 867-68 (2002), citing 
Cleveland Board of Education v. Loudermill
, 470 U.S. 532, 538-41, 84 L. Ed. 2d 494, 501-03, 105 S. Ct. 1487, 1491-93 (1985); 
Board of Education v. State Board of Education
, 292 Ill. App. 3d 101, 113 (1997).   Therefore, petitioner could not be terminated, thereby depriving her of this property interest, without due process of law.  
Prato
, 331 Ill. App. 3d at 868.     

The constitutional guarantee of due process encompasses both procedural and substantive due process.   
Segers v. Industrial Comm'n
, 191 Ill. 2d 421, 433-34 (2000).   "Procedural due process claims concern the constitutionality of the specific procedures employed to deny a person's life, liberty or property" and 
are "meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."  
Segers
, 191 Ill. 2d at 434.   Substantive due process prevents the government from taking certain action even if it does provide proper procedural safeguards.  
Casanova v. City of Chicago
, 342 Ill. App. 3d 80, 91 (2003).    

We find that petitioner’s argument in this case does not relate to the procedures she was afforded prior to her dismissal.  See, 
e.g
.,  
Loudermill
, 470 U.S. at 547-48, 84 L. Ed. 2d at 507, 105 S. Ct. At 1496 (for the purpose of terminating a public employee who may only be terminated for cause, procedural due process is satisfied if the employer makes a final judgment based upon a full evidentiary hearing that is subject to judicial review);  
Munoz v. Department of Registration & Education
, 101 Ill. App. 3d 827, 829 (1981) ("the essence of procedural due process is notice and an opportunity to be heard").  She was, in fact, provided notice and given a full evidentiary hearing.  Rather, her contention is one of substantive due process, 
i.e.
, that the Merit Board violated her substantive due process rights when it dismissed her for violating the zero-tolerance policy even though she unknowingly ingested the illegal substance.    

Where, as in this case, no fundamental constitutional right is implicated, we review the statute or rule being challenged by applying a rational basis test. 
Russell v. Department of Natural Resources
, 183 Ill. 2d 434, 446 (1998).  Under this test, the statute or rule "must bear a reasonable relationship to the public interest intended to be protected, and the means adopted must be a reasonable method of accomplishing the desired objective."  
Russel
, 183 Ill. 2d at 447. 

In the case at bar, the purpose of the sheriff’s office drug-free workplace policy, in relevant part, is to "take all reasonable measures to provide and maintain a work environment free of unlawful use of drugs or controlled substances and prevent an otherwise pervasive societal problem from invading the ranks of its sworn employees."  In accordance with this purpose, the abuse of legally prescribed drugs or controlled substances by sworn personnel, at any time, while on or off duty is strictly prohibited.  Violations of the policy by a sworn merit employee, substantiated by a confirmed positive drug test, will result in the Sheriff's referral of charges to the Merit Board seeking the employee's discharge.  

It goes without saying that the sheriff's office has a very strong interest in preventing employees who are entrusted with protecting the public safety from becoming a danger to themselves or others by the use or abuse of illegal drugs.  It would be absurd to even suggest that zero-tolerance policies in a workplace such as the sheriff’s office are inherently bad and serve no legitimate state purpose. 

The issue, however, is not whether the drug-free policy is reasonable and serves a legitimate state purpose but whether its application by the Merit Board in the instant case was rationally related to the legitimate state objective of providing and maintaining a work environment free of unlawful use of drugs or controlled substances.  

While we acknowledge that the Merit Board 's order did not contain a specific finding that petitioner tested positive for the presence of cocaine metabolites due to her innocent consumption of the Mate de Coca tea, a review of the extensive factual findings leads us to conclude that the Merit Board so found.  The order reads, in pertinent part, that the "evidence established" that petitioner had recently been ill and had ingested tea to alleviate her symptoms; that this tea was purchased in Peru when she and her husband traveled there to adopt a child; that the tea contained a controlled substance which would have been broken down by boiling and would still produce a positive drug screen due to the presence of cocaine metabolites; that the amount of cocaine metabolites in petitioner’s urine was very small, indicating that she was not a chronic user or abuser of illegal drugs; and that the amount of cocaine metabolites found in her system was consistent with consuming the Mate de Coca tea.

The Sheriff points to the testimony of its expert witness, M.P. George, that the cocaine in the Mate de Coca tea would not be broken down by boiling and that pure cocaine would be in a person’s system after drinking the tea.  While Mr. George did testify that the cocaine would not be broken down by boiling the tea,  the Merit Board’s order apparently discounted that testimony and adopted that of petitioner’s expert witnesses because it specifically states that the cocaine would have been broken down by the process of boiling the tea.  Furthermore, while George testified that a person consuming this tea would feel its effects, he admitted that the effects would only be slightly more than those from drinking caffeinated tea.  Contrast that testimony to the testimony of all of petitioner’s expert witnesses and petitioner herself, who said that a person would not feel its effects.  Lastly, although all of the expert witnesses conceded that they had no personal knowledge as to how the cocaine metabolite got into petitioner’s system, the Merit Board’s order states that the amount found in petitioner’s system "was consistent with consuming the Meta DeCoca [
sic
] tea," a clear indication that the Merit Board found the uncontraverted testimony of petitioner and her husband to be credible based upon the corroborating physical evidence.  

Here, it was uncontraverted that petitioner tested positive for cocaine metabolites in excess of the threshold established under the applicable testing procedures.  There was a stipulation to that effect.  However, as petitioner’s counsel pointed out during oral arguments, it would have been pointless for petitioner to have called numerous witnesses and presented extensive evidence over a period of several days, and for the Sheriff to have called a rebuttal witness, if the Merit Board was required under the policy to automatically dismiss her for cause based solely upon the positive drug screen.  In other words, the Merit Board was required to consider the circumstances surrounding the charge.

During oral arguments we asked counsel for the Sheriff whether the Merit Board could terminate an employee for unwittingly consuming a controlled substance and posed hypothetical examples involving a person who leaves her drink sitting unattended on a bar while someone comes along and slips a drug into it, or where a person is forcibly bound and gagged and forced to ingest an illegal substance.  The question was whether an employee under those circumstances would still be subject to dismissal.  Counsel for the Sheriff answered “yes” because “zero tolerance” does not care whether an employee knew she was consuming a controlled substance or not.  In fact, the Sheriff has maintained throughout these proceedings that since it is undisputed that petitioner tested positive for cocaine, the Merit Board was required to dismiss her because her knowledge of what was contained in the tea was irrelevant.  However, the Sheriff cites to no authority, the policy itself provides no basis, and research reveals no case law to support such an absolute and inflexible application of the Sheriff's drug-free workplace policy.  See SoCheung Lee, 
Serving the Invisible and the Many: U.S. Supreme Court Upholds the 
Rucker
 One-Strike Policy
, 11-Sum J. Affordable Housing & Community Dev. L. 415, 420 (2002) (" 'zero-tolerance' has never been understood as a matter of law, regulation, or policy to mean absolute inflexibility"); see also 
Department of Housing & Urban Development v. Rucker
, 535 U.S. 125, 133-34, 122 L. Ed. 2d 1230, 1235, 152 S. Ct. 258, 268  (2002) (the Supreme Court in upholding against a constitutional attack the zero-tolerance policy contained in the 1988 Federal Anti-Drug Abuse Act, which requires lease terms that provide local housing authorities the power to evict a tenant when a household member or guest is involved in a drug-related criminal activity, regardless of whether the tenant knew, or should have known, about the criminal activity, noted that "the statute does not require the eviction of any tenant who violate[s] the lease provision.  Instead, it entrusts that decision to the local public housing authorities, who are in the best position to take account" of the purpose of the Act and the circumstances surrounding the offending action prior to determining whether to evict the tenant).  

The Sheriff argues that if we make knowledge an issue of relevance or a consideration by the Merit Board regarding the circumstances surrounding the positive drug screen, it would open the door for future employees who are similarly charged to falsely maintain that they, too, did not know they were ingesting an illegal substance.  While it is true that an employee may lie about how an illegal drug got into his system, that does not mean it is unnecessary to address the question of what he knew or did not know or the circumstances surrounding the ingestion.  That employee will be held to his evidence, as in any other type of hearing or trial.    

The Sheriff also argues that there is no question that petitioner “knowingly” drank the Mate de Coca.  However, petitioner has never denied that she drank the tea.  Instead, she has maintained throughout these proceedings that she was unaware of its illegal contents.  While there is a notice sent to all employees that they are responsible for insuring that any herbal medicines or other nonprescription or over-the-counter special remedies do not contain controlled or illegal substances, the evidence established that petitioner and her husband made an inquiry and were assured by the Peruvian physician that there was no cocaine in the tea.  There is nothing more they could have done.  Although the assistant State’s Attorney inquired of petitioner’s husband as to whether he read the label on the tea box, no evidence was ever introduced that cocaine was listed as being one of the ingredients.  

This court believes that the application of the drug-free workplace policy by the Merit Board in this case was not rationally related to the specified purpose of the policy and, therefore, violated petitioner’s substantive due process rights.  See 
Seal v. Morgan
, 229 F.3d 567, 579, 581 (6
th Cir. 2000) (suspending or expelling a high school student for weapons possession, pursuant to a zero-tolerance policy that prohibits the presence of dangerous weapons on school grounds at any time, even if it was subsequently established that the student did not knowingly possess the weapon that was discovered in the glove compartment of the student's car, would not be rationally related to any legitimate state interest in order to survive a substantive due process challenge).

Based upon our determination, we shall not address petitioner’s remaining claim that the Merit Board's decision was against the manifest weight of the evidence.   

For the foregoing reasons, we reverse the decision of the Merit Board to dismiss petitioner for cause and reverse the order of the circuit court of Cook County affirming the Merit Board's decision.  We remand this cause to the circuit court of Cook County with instructions to enter an order reinstating petitioner in her position as an employee of the Cook County sheriff’s office. 
Reversed and remanded with instructions. 

HALL and KARNEZIS, JJ., concur.