FIFTH DIVISION
November 13, 2009

1-08-2703

| | | |
|---|---|---|
| THE COOK COUNTY BOARD OF REVIEW, | ) | Petition for Review of an Order of the Property Tax Appeal Board |
| | ) | |
| Petitioner, | ) | Docket Numbers: |
| | ) | 03-27407.001 through 03-27407.113-R-3 |
| v. | ) | 04-26444.001 through 04-26444.113-R-3 |
| | ) | 05-23475.001 through 05-23475.113-R-3 |
| THE PROPERTY TAX APPEAL | ) | |
| BOARD, an Administrative Agency, and | ) | |
| FULTON HOUSE CONDOMINIUM | ) | |
| ASSOCIATION, Taxpayer, | ) | |
| | ) | |
| Respondents. | ) | |

PRESIDING JUSTICE TOOMIN delivered the opinion of the court:

In the instant matter, we consider the quantum and quality of evidence submitted in a real estate assessment appeal and the interplay of the administrative rules on the content of those proceedings. Following a hearing, the Illinois Property Tax Appeal Board (PTAB) issued a decision modifying the assessed value of the property at issue for 2003, 2004, and 2005. Thereafter, the Cook County Board of Review (Board) petitioned for review of the PTAB's order. On appeal, the Board contends that (1) the PTAB erred as a matter of law in reducing the assessed value of the property; and (2) the findings as to the market value and tax assessment were against the manifest weight of the evidence. Both the PTAB and the Fulton House Condominium Association (Fulton House) are responsive parties to this action. For the following reasons, we affirm the PTAB's decision.

## BACKGROUND

The subject property is located at 345 N. Canal Street in Chicago, Illinois. It is improved with a 16-story building comprised of 94 residential condominium units, 18 commercial units, and 1 industrial unit. Originally built in 1905, the property was utilized as a cold storage facility until 1978. In 1980 and 1981 it was renovated to its current status as a mixed-use building.

The Board issued tax assessments on the property of $2,874,995 for 2003 and $2,884,333 for both 2004 and 2005. These amounts were based upon an estimated market value of $14,857,490. In turn, Fulton House appealed each of these assessments to the PTAB. These appeals were consolidated before the PTAB and Fulton House and the Board each submitted documentation for the PTAB's consideration. Fulton House provided an appraisal prepared by Schlitz Appraisal Services, Inc. (SAS), a professional appraisal company. The Board's submissions consisted of a document entitled, "Board of Review Notes on Appeal," as well as three memoranda prepared by employees of the Board or the Cook County assessor's office. After the administrative record was closed, a hearing was convened before a hearing officer on October 18, 2007.

Fulton House called Robert Schlitz, the president of SAS, to testify regarding the appraisal he prepared for the subject property. Schlitz was tendered as an expert in the area of condominium appraisals. Based on his qualifications, designations, and experience in conducting thousands of condominium appraisals, the hearing officer accepted the proffer. Schlitz's testimony essentially concerned the appraisal report he prepared and submitted to the PTAB[1].

---

[1] Although Schlitz did not testify to each and every line of his report, because his

1-08-2703

Schlitz testified that he appraised the subject property on numerous occasions during his professional career, including twice when he was employed by the assessor and as many as six times subsequently in private practice. For the purposes of the instant appeal, an appraisal was prepared by SAS with an "effective date of value of January 1, 2003." Schlitz described the history of the building, its makeup, the problems associated with it over time, and its condition at the time of the appraisal, which he described as "average." He likewise described the building as an average condominium, rather than a deluxe condominium. Schlitz valued the property based on the three traditional approaches used in establishing property values, namely cost, income, and market with adaptations. He relied most heavily on the sales approach in assigning a value to the property, as this is the traditional approach.

Utilizing the "direct sales approach," the land on which the building is situated was valued at $900,000 "As Though Vacant." This value was arrived at based on comparisons and evaluations of sales of comparable properties in the immediate area of the building. The appraisal then turned to the "Cost Approach to Value." This method takes into account the estimated value of the property if it were vacant, "estimating the replacement cost new of the improvements and deducting the appropriate accrued depreciation determined from the market of similar improved properties that recently sold." Utilizing this approach yielded a value, of $12,800,000 as reconciled.

The appraisal report then utilized the "Income Approach to Value" or "Income

testimony and the appraisal report are equally part of the record before us, we treat them as one-in-the-same for the purposes of our review.

3

Capitalization Approach." This method looks at "the net present worth of the property's prospective current and future potential income and/or benefits during the remainder of its productive life." While this approach is not typically fully relevant to condominiums as they are most-often owner occupied, because "the property can not [*sic*] be sold out as a condominium leasing becomes the only viable alternative and the Declaration permits subletting it must be considered as to valuation." This methodology likewise considered comparable properties in the area. Three values were ascertained, a "Mortgage Equity" value of $11,220,198, a "Gross Income Multiplier" value of $12,253,494, and a "Direct Capitalization" value of $12,649,868. Considering these values, the "purpose and function" of the appraisal, and other relevant factors, SAS concluded that the value of the property would fall somewhere between these three values. The report concluded that by using the income approach, the building had a value of $12,250,000.

The appraisal report next examined the "Direct Sales Comparison Approach to Value." The report describes this approach as follows:

> "In the Sales Comparison Approach, sales and offerings of similar type properties are analyzed and adjusted for a value indication of the property being appraised. This approach reflects the actions of buyers and sellers in the market and is primarily based upon the principle of substitution."

In this case, the analysis focused on properties that were converted to residential use, like the subject property. This method of determination yielded a value of $12,750,000 for the property.

A subset of the sales comparison approach was a multiple regression analysis, which involves examining individual sales, when they took place, the sale price, the unit's percent of

ownership, location in the building, the floor height, number of bathrooms and bedrooms, the buyer and seller, the real estate taxes, the tax rate, information from the recorder of deeds on prior sales, and mortgage and financing information on the most recent sale. This methodology compared "sales within the subject to one another." Schlitz did not think it was possible to validly evaluate the units as a whole without taking these factors into account because of the way he believed they influenced the value. Here again, the property was appraised at a value of $12,750,000. His report also included a detailed table applying the multiple regression analysis to each of the individual units in the subject building thereby providing a value for each. The total value of $12,750,000 was similarly broken down reflecting an aggregate value for the residential, mixed-use, commercial and industrial units by category.

According to Schlitz, this methodology was not utilized by the assessor's office for cooperatives or condominiums "due to lack of reliable data and inadequate staff." Nevertheless, it was used on all other types of residential real estate, including town homes, single-family homes, and apartments consisting of up to six units.

The report determined the value of the property in several stages. First it noted that the appraisal was based upon "82 total sales over time and the 20 most recent individual sales of units in the Subject." First, the "Aggregate Retail Future Value @ 100% Sellout" was estimated to be "$13,807,610 to $14,160,193 'As Projected.' " It was then noted how the values established as to cost, income capitalization, and sales comparison were:

> "adapted to conform to Illinois Law, the Condominium Property Act, Uniform
>
> Standards Principles of Appraisal Practice (USPAP), and the condominium concept.

Any minor differences in the value conclusions reached, together with market trends, were weighted and reconciled in order to arrive at a reconciled estimate of value for the entire property inclusive of the land, units, and common elements components. We have utilized these same sales in a Multiple Regression Analysis to best address the variance in the market for valuation of the individual units. It is our opinion this methodology which is utilized in the Assessment process to value all other residential property is far superior to all other methods."

The "Discounted Wholesale Present Value Net Present Value" was estimated to be $12,602,056 to $12,842,044 'As Is.' " The "Aggregate Retail Market Value" was set at $12,679,457 and the "Wholesale Discount Value" was set at $13,973,865. Therefore, the *ad valorem* value of the property "for the purposes of real estate taxation as of January 1, 2003," was a "Retrospective Market Final Value of $12,750,000 'As Reconciled.' "

The hearing officer posed several questions to Schlitz, in addition to several clarifying questions interposed during the direct examination. First, the hearing officer noted that the report appeared to include five sales that took place after the effective date of the appraisal, *i.e.* after January 1, 2003. Schlitz described those sales as being a part of a second test group that was not used in the report. He explained, "You hold out sales that occurred after the date and see how well your model also predicts." The hearing officer likewise inquired as to the basis for the statement in the report that the units in the subject were overassessed. Schlitz explained that this opinion was based upon comparisons with other similar properties in the area and their rates of taxation per square foot. Similarly, the calculation of the value of the air rights on the subject

property was set based upon a comparison with a similar property at 300 Canal Street.

On further questioning by the hearing officer, Schlitz described the highest and best use of the property as individual condominiums "as approved" and as a mixed-use condominium "as vacant" including larger units and on-site parking. The hearing officer then asked Schlitz to provide a column by column explanation of the table establishing values for the individual units in the subject property, which he did in accordance with her questions.

The Board's representative, Matt Panush, then conducted a cross-examination of Schlitz. It was established that the sales utilized in the report matched up with those used by the Board. Schlitz noted that the sales he utilized in preparing the report were verified by second and even third sources to assure their accuracy. Panush inquired specifically about why there was a discrepancy between the price shown for a particular unit sale in the report versus the sale price noted by the Board. Schlitz explained that he could not say where the Board's price came from, but he explained that the prices he used were obtained from either the sale participants, the recorder's office, the Multiple Listing Service, or other sources. Regardless of the source, though, the prices were subjected to second-source verification.

Panush claimed that nearly one-third of the 30 sales used had discrepancies in the sale price. Yet, at the same time, he conceded the existence of problems in obtaining accurate information for a variety of reasons. Fulton House's counsel objected to the offering of this evidence as hearsay and because several of the questioned sales occurred after the effective date of the appraisal and were, therefore, not relevant. The hearing officer overruled the objection, reasoning that the information was timely submitted and contained in the PTAB record. As to

relevance, the hearing officer overruled the objection and indicated "we'll let PTAB accord the proper weight to the documentation."

The hearing officer next considered the materials submitted by the Board. Panush explained a "Summary" included in the record as follows:

"We believe that just over 85 percent of this building is residential use and the remaining part of it being commercial use.

We have gone ahead and Tom Jaconetty [then-chief deputy of the Cook County Board of Review] has determined that the commercial units in the building has [*sic*] a market value of roughly 1.8 million. We also concluded that the residential portion has a market value of roughly 21,750,000. When combined, we end up with the commercial and residential units, a total market value of 23,592,680 for the entire building both residential and commercial."

Another memorandum prepared by Panush addressed itself to 30 sales of residential units in the subject property. For each unit there was an allocation of $3,000 for "personal property." Based on these considerations, the market value for the residential portion of the property was estimated at $21,656,908. In turn, an estimated value of $25,346,686 was determined for the entirety of the subject property. These values were reached by calculating the total consideration of the 30 individual sales, less the personal property allocation, and the percentage interest in the building these sales represented, specifically 25.02911%, to establish the full value of the building. That figure was then multiplied by the residential percentage, 85.44276%, to yield the estimated value of the residential units.

1-08-2703

Then, regarding another submission consisting of a printout and numerous handwritten calculations and computations, Panush offered the following:

"All over the page these are Tom Jaconetty's notes. He seems to be using different methodologies to try and determine what the commercial and industrial - - I think there's one PIN actually that has an 8/5/89 indicating industrial PIN in this building trying to come up with a value for the commercial and industrial portion of this building.

It looks like the different methodologies that he's used. He came up with several different numbers and for some reason he seemed to have signed off on a market value of 2,875,000 which is not consistent with what he has in his summary which is the commercial unit being 1,842,000.

All of the numbers that he has on this page, whatever method he used, one seems to be using a sales approach, one seems to be using a price per square foot. Whatever approach he used, he came out to a much higher number than he summarized at 1,842,000."

In addition, there were several printouts reflecting sales of units over time. According to Panush, these documents were included to show the Board's belief that "the market value is definitely trending up." Specifically, there was approximately a 12% average increase in the units noted in the printouts. In response to the hearing officer's inquiry as to the value for the commercial units, Panush conceded that he could not explain how Mr. Jaconetty established them.

Panush was then called as a witness by Fulton House. He testified that he did not

independently verify any of the sales by either reviewing the deeds or talking to the parties. Additionally, no adjustments were made on any of the sales as to the timing, conditions, or location of the property in the subject property. Moreover, Panush had not discussed the valuations with Jaconetty since the initial decision was rendered by the Board of Review. Consequently, his review of the submissions attributed to Jaconetty were interpretations made to the best of his ability as to their meaning.

Schlitz was recalled in rebuttal and clarified some of his prior testimony. Specifically, he noted that although some sales after January 1, 2003, were included in his report, the vast majority predated the effective date of the appraisal. Moreover, he would rely more heavily on sales prior to January 1, 2003, in creating his report than those that came later.

The PTAB then took the matter under advisement and ultimately issued its decision on August 29, 2008. In our opinion, the decision thoroughly and completely recited the evidence presented and the testimony heard at the hearing. Citing section 1910.65(c) of title 86 of the Illinois Administrative Code (86 Ill. Adm. Code §1910.65(c), amended at 21 Ill. Reg. 3721, eff. March 6, 1997), the PTAB noted that "Proof of market value may consist of an appraisal, a recent arm's length sale of the subject property, recent sales of comparable properties, or recent construction costs of the subject property." Based upon the evidence presented, the PTAB determined a partial reduction and a partial increase in the tax assessment was warranted.

In turn, the PTAB determined the best evidence of fair market value was found in the SAS appraisal and supporting testimony. Specifically, the PTAB viewed with favor the approaches used by the appraiser, his background and experience, and the myriad factors considered in

reaching his value calculations. Conversely, the PTAB "accord[ed] little weight to the board of review's evidence for: an unrecognized methodology was employed containing only a limited number of unit sales with the building; an arbitrary amount deducted for personal property; and no adjustments made for the units' characteristics." Therefore, the market value expressed in the SAS appraisal was adopted for the 2003, 2004, 2005 triennial assessment period. Moreover, Fulton House's request that the assessment values roll forward throughout the period was granted.

The Board now appeals contending the PTAB's decision was in error as a matter of law due its reliance on the SAS appraisal to establish the market value. The Board asserts that because the appraisal did not rely on the recent sales within the subject property, it violated the rule of uniformity, and improperly disregarded the Board's evidence of recent sales. Additionally, the Board contends that the PTAB's findings were against the manifest weight of the evidence.

ANALYSIS

At the outset, we acknowledge that our review of decisions of the PTAB is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq*. (West 2008)). 35 ILCS 200/16-195 (West 2008); *Consumers IL Water Co. v. Vermilion County Board of Review*, 363 Ill. App. 3d 646, 649, 844 N.E.2d 71, 73 (2006). The scope of our review extends to "all questions of law and fact presented by the entire record" before us. 735 ILCS 5/3-110 (West 2008). Moreover, "The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2008). As a reviewing court, we do not weigh the evidence or substitute our judgment for that of the administrative agency. *Cinkus v. Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210, 886 N.E.2d 1011, 1018 (2008).

11

Therefore, we will not reverse the factual findings of an administrative agency unless they are against the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident. *Cinkus*, 228 Ill. 2d at 210, 886 N.E.2d at 1018. Conversely, an agency's determination on a question of law is not binding on us, rendering our review "independent and not deferential." *Cinkus*, 228 Ill. 2d at 210, 886 N.E.2d at 1018.

We recognize that administrative review proceedings present three different types of questions: those of fact, those of law, and mixed questions of law and fact. *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 243, 902 N.E.2d 652, 660 (2009). In turn, each type of question engenders a different standard of review. Factual determinations are subject to reversal only if they are against the manifest weight of the evidence. *Republican Party*, 232 Ill. 2d at 243, 902 N.E.2d at 660. Determinations of questions of law are reviewed using a *de novo* standard. *Republican Party*, 232 Ill. 2d at 243, 902 N.E.2d at 660; *Cinkus*, 228 Ill. 2d at 210, 886 N.E.2d at 1018. Lastly, mixed questions of law and fact will be reversed on appeal only when they are deemed "clearly erroneous." *Republican Party*, 232 Ill. 2d at 243-44, 902 N.E.2d at 660. This intermediate standard of review falls between the manifest weight standard and the *de novo* standard and accords a measure of deference to the underlying agency decisions. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 392, 763 N.E.2d 272, 280 (2001). Our supreme court has consistently adhered to the approach that " '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service*, 198 Ill. 2d at 393, 763 N.E.2d at 280-

81, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

Here, the Board offers a discussion of the standard of review addressing both the *de novo* standard and the manifest weight standard. However, the Board's treatment deals only a glancing blow to the issue of the actual standard of review to be utilized with further obfuscation of the matter within the argument. Nevertheless, the Board complains that the PTAB "erred as a matter of law" only to conclude that section with the following: "Based on recent sales data submitted into the record, the PTAB's finding of market value was also against the manifest weight of the evidence." The PTAB and Fulton House counter, albeit in subtly different ways, that no question of law is presented and that, instead, the proper standard of review is the manifest weight standard. We agree. A careful review of the record and the briefs submitted by the Board reveal that no question of law was addressed by the PTAB and none is properly raised on appeal. Consequently, insofar as the dispositive issues raised on appeal are concerned, we are disposed to review the PTAB's factual determinations and ultimate conclusion utilizing the manifest weight of the evidence standard. *Cinkus*, 228 Ill. 2d at 210, 886 N.E.2d at 1018.

Prior to conducting our analysis of the PTAB's ultimate decision, we first consider the forfeiture arguments raised by the PTAB. In its responsive brief the PTAB asserts that the failure of the Board to raise certain issues at the hearing operate as a waiver of those issues on appeal. The PTAB challenges the Board's argument that "Mr. Schlitz's multiple regression analysis simply results in values that do not reflect the amount of recent sales." It likewise challenges the Board's attempt to claim the decision violates the rule of uniformity in the rates of taxation as delineated in

article IX, section 4, of the Illinois Constitution (Ill. Const. 1970, art. IX, §4). We recognize that arguments or objections that are not made during the course of the administrative hearing process but instead are raised for the first time on review are deemed waived. *National City Bank of Michigan/Illinois v. Property Tax Appeal Board*, 331 Ill. App. 3d 1038, 1044, 780 N.E.2d 691, 696 (2002).

As to the first challenge, the record clearly reflects that Schlitz was not cross-examined on this point to any meaningful degree. There does not appear to be any argument in the record opposing his calculations. Instead, what the record indeed reflects is limited to an inquiry posed to Schlitz regarding his use or potential use of sales that came after the effective date of the appraisal report. This is a far cry from the Board's argument offered on appeal. Moreover, the rules of procedure before the PTAB provide:

> "The board of review must provide substantive, documentary evidence or legal argument sufficient to support its assessment of the subject property or some other, alternate valuation. Failure to do so will result in a decision by the [PTAB] based upon the information submitted by the contesting party and, if applicable, the evidence submitted by any intervening party." 86 Ill. Adm. Code §1910.63(c), amended at 24 Ill. Reg. 1247, eff. January 5, 2000.

Therefore, insofar as the Board's argument relates to a challenge to the degree by which the values obtained in the multiple regression analysis fail to reflect recent sales, it is waived. Likewise, the table included as an appendix to the Board's brief is hereby stricken. We are guided in this action by section 1910.40(a) of title 86 of the Illinois Administrative Code requiring the

1-08-2703

Board to submit "The Board of Review Notes on Appeal and all written and documentary evidence supporting the board of review's position" within 90 days of the notice of filing of an assessment appeal. 86 Ill. Admin. Code §1910.40(a), amended at 33 Ill. Reg. 7914, eff. July 1, 2009 (amendment increased Board's time to submit evidence from 30 to 90 days). Additionally, section 3-110 of the Administrative Review Law provides, "No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court." 735 ILCS 5/3-110 (West 2008).

A similar result obtains with respect to the Board's uniformity argument. As noted, arguments and objections may not be raised for the first time on appeal. The uniformity argument is unquestionably raised for the first time on appeal. Since this argument was not raised during the administrative proceedings, it fell outside the consideration of the PTAB and cannot now be raised on appeal. See *National City Bank*, 331 Ill. App. 3d at 1044, 780 N.E.2d at 696; 86 Ill. Adm. Code §1910.90(l), amended at 31 Ill. Reg. 16240, eff. November 26, 2007 ("Decisions of the [PTAB] shall be based on the evidence contained in the administrative record").

We next consider whether the PTAB's decision in modifying the assessment of the Fulton House property was against the manifest weight of the evidence. Prior to the administrative hearing, both sides had the opportunity to present documentary evidence in support of their position. A review of the record reveals a marked disparity between the quantum of evidence offered by the Board as against that offered by Fulton House. The submissions from Fulton House were significantly comprised of the SAS appraisal report and its related documents. The report itself was an extensively detailed compilation of factual and analytical materials relative to the

15

valuation of the subject property. Conversely, the Board's submissions consisted of a very limited scope of documents, many of which were of composed of printouts containing handwritten notes in the margin. Although the Board's representative at the hearing attempted to decipher these materials – only one of which he clearly produced himself – even he was challenged to do so. We therefore conclude the Board's documentation was not particularly cogent and did not provide any sort of meaningful analysis to support the valuation and assessment it established.

The same measure of disparity manifested through the course of the hearing. As noted, the majority of the testimony offered came from Fulton House's appraiser, Robert Schlitz, who testified extensively to the appraisal report he prepared. Schlitz offered detailed explanations of the methodologies he used in preparing the report and answered questions from Fulton House's counsel, the hearing officer, and the Board's representative. His testimony also included explanations of specific portions of his report. The Board did not call any witnesses as to valuation *per se*. Matt Panush did answer some questions posed by the hearing officer as well as when he was called by Fulton House's counsel. Nonetheless, the Board did not call any witness or present any additional evidence in support of its valuation. Instead, Panush asserted that what was presented by the Board was "a very nice mix" and "representative" set of sales within the property. He likewise pointed to the Board's prior submissions to support its valuation.

Having carefully reviewed the record before us, we conclude the PTAB's decision was not against the manifest weight of the evidence. We perceive nothing about the decision that evinces a mistake of any measure permeates its logic or its conclusion. See *AFM Messenger Service*, 198 Ill. 2d at 393, 763 N.E.2d at 280-81. Likewise, we discern no error on the part of the PTAB in

placing significant reliance upon the SAS appraisal report or Schlitz's testimony thereon. The valuations provided in the report and related testimony were clearly the product of extensive research, comparison, analysis, and evaluation. On the other hand, the valuation evidence offered by the Board was utterly conclusory with little or no foundation or explanation. Although the Board may have disagreed with the process or conclusions of the SAS appraisal, those challenges should have been made during the course of the administrative proceedings through the crucible of cross-examination or by the introduction of competent evidence.

Our review of the record persuades that the evidence presented in favor of Fulton House's position was comparatively overwhelming. Although the hearing raised some questions as to certain aspects of the information upon which it was based, those issues do not alter our conclusion. That the Board disagrees with the appraisal report and the resulting PTAB decision is not sufficient to deem that decision against the manifest weight. The Board was given ample time and opportunity to offer evidence to support its position and failed to do so. Nevertheless, the fact that the PTAB raised some assessments while lowering the majority is indicative of the fact that there was evidence weighed in reaching its conclusions. The findings and decision of the PTAB were entirely reasonable, appropriate, and consistent with the manifest weight of the evidence.

For the foregoing reasons, we affirm the decision and findings of the Property Tax Appeal Board.

Affirmed.

TULLY and FITZGERALD SMITH, JJ., concur.

1-08-2703

| | |
|---|---|
| Please Use Following Form: | |
| Complete TITLE of Case | COOK COUNTY BOARD OF REVIEW, Petitioner, v. ILLINOIS PROPERTY TAX APPEAL BOARD, an administrative agency created by 35 ILCS 200/7-5, and FULTON HOUSE CONDOMINIUM ASSOCIATION, taxpayer, Respondents. |
| Docket No. COURT Opinion Filed | No. 1-08-2703 Appellate Court of Illinois First District, FIFTH Division November 13, 2009 (Give month, day and year) |
| JUSTICES | JUSTICE TOOMIN delivered the opinion of the court: Fitzgerald Smith, P.J., with Tully, J. concur [s] dissent[s] |
| APPEAL from the Circuit Ct. of Cook County, Chancery Div. | Lower Court and Trial Judge(s) in form indicated in the margin: |
| For APPELLANTS, John Doe, of Chicago. For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel) Also add attorneys for third-party appellants or appellees. | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented. |

Attorneys for Petitioner (Cook County Board of Review)

Anita Alvarez
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, IL 60602
312/603-4712

Patrick T. Driscoll, Jr.
Deputy State's Attorney
Chief, Civil Actions Bureau

Of Counsel:      Benjamin R. Bilton
                 Charles J. Cullinan

Attorneys for Respondent (Fulton House Condominium Ass.)          Thomas J. McNulty

18

1-08-2703

David S. Martin
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 1700
Chicago, IL 60602
312/269-8077

Attorneys for the Illinois Property Tax Appeal Board:

Lisa Madigan
Attorney General
State of Illinois

Michael A. Scodro
Solicitor General

100 W. Randolph Street, 12th Floor
Chicago, IL 60601
312/814-3312

Carl J. Elitz
Assistant Attorney General
100 W. Randolph Street, 12th Floor
Chicago, IL 60601
312-814-2109