2021 IL App (1st) 200183-U

No. 1-20-0183

Order filed June 24, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| LEONARDO RODRIGUEZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CH 6474 |
| | ) | |
| THE CITY OF CHICAGO, | ) | Honorable |
| | ) | Eve M. Reilly, |
| Defendant-Appellee. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Where the human resources board of the city discharged plaintiff based on findings that he violated multiple provisions of a personnel rule when he tested positive for cocaine and marijuana and admitted to using drugs illegally, plaintiff's writ of *certiorari* petition is denied and the board's decision is affirmed because the findings were not against the manifest weight of the evidence and the decision to discharge plaintiff was not arbitrary, unreasonable or unrelated to the requirements of his service.

¶ 2    Plaintiff Leonardo Rodriguez worked for the City of Chicago (City) but was discharged

after the City's human resources board (Board) found that he violated several provisions of a

personnel rule when he tested positive for cocaine and marijuana and admitted to using drugs illegally. Rodriguez filed a writ of *certiorari* petition in the Circuit Court of Cook County, which denied his request and affirmed the Board's decision.

¶ 3 On appeal, Rodriguez argues that the Board's findings were against the manifest weight of the evidence because (1) the City lacked the requisite evidence of significant property damage to send him to alcohol and drug testing after he was involved in a vehicle collision, and (2) the hearing officer improperly admitted into evidence an affidavit regarding a car repair estimate, a police officer's testimony regarding his estimate of the damage, and the drug testing laboratory report.

¶ 4 Rodriguez also argues that the Board's discharge sanction was not warranted because (1) there was no finding that he was under the influence of drugs or used or possessed illegal drugs while at work, and (2) the Board abused its discretion by interpreting certain terms in the City's personnel rules broadly and contrary to their commonly accepted meaning.

¶ 5 For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 6                                    I. BACKGROUND

¶ 7 Rodriguez was a production assistant for the City's Department of Cultural Affairs and Special Events (DCASE). His job duties included driving a City vehicle and transporting other City employees. On the morning of Friday, March 10, 2017, Rodriguez learned from his supervisor that he would be driving several employees from DCASE's offices at the

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

Chicago Cultural Center to a museum on the southside of Chicago. He had driven a City van on each of the preceding days of that week as well.

¶ 8     Rodriguez departed the Cultural Center at approximately 10:45 a.m. with nine DCASE employees as his passengers. His supervisor Jose Chao drove a second van to the museum. As Rodriguez attempted to turn right onto southbound Michigan Avenue from Washington Street, a collision occurred between his van and a car driven by Keianna Stone. Specifically, there were two right turning lanes at the location in question. Rodriguez was in the center-most lane and Stone was in the lane closest to the sidewalk. As the traffic in the right-turning lanes began to move, another vehicle, which was in front of Stone's car, stopped because its lane was partially blocked by construction cones. When Stone attempted to drive around the stopped car by making an extra-wide right turn, her car collided with Rodriguez's van. Stone's car sustained scrapes and scratches to its left front fender and bumper area, and Rodriguez's van sustained scrapes and scratches to its passenger-side.

¶ 9     Rodriguez and Stone pulled over, and Rodriguez notified Chao of the accident. Chao came to the scene and took most of Rodriguez's passengers in the other van. Two City employees remained at the scene with Rodriguez. Police officer Mark Mirabelli arrived, spoke with Rodriguez and Stone, and filled out a report.

¶ 10     About 12:30 p.m., Chao and Rodriguez went to the office of DCASE's human resources director, Lisa Lorick, to discuss the accident. Rodriguez's direct supervisor John Trick also joined the meeting later. During the meeting, Lorick advised Rodriguez that he would have to go for drug

and alcohol testing, and Rodriguez completed the testing paperwork. Then Rodriguez went with Chao and Trick to a clinic for urine testing. Later that week, the lab called Rodriguez and informed him that his test results were positive.

¶ 11    Rodriguez received a letter dated March 21, 2017, from the City informing him that he had tested positive for cocaine and marijuana. In early April 2017, Rodriguez received a letter from the City, which stated he had failed a drug test and offered him an opportunity to respond. Rodriguez responded in a letter to DCASE's commissioner on April 13, 2017. In that letter, Rodriguez apologized and stated that he had "let people down." His letter acknowledged his "understand[ing] that the disciplinary action is mostly due to the failed drug test that followed the accident." He also stated that he was "embarrassed" about his "transgressions *** during the evening two days prior" and referred to a party he attended on Wednesday, March 8, 2017.

¶ 12    The City discharged Rodriguez for violating provisions of a personnel rule by using illegal drugs and testing positive for cocaine and marijuana following an on-duty accident. Rodriguez appealed his discharge to the Board.

¶ 13    At the hearing before a hearing officer, Rodriguez testified that when he met with Lorick shortly after the accident, he explained what happened in detail. He did not give her the police report at that time because Lorick did not ask him for it and he did not know that he needed to turn it in immediately. After he completed the paperwork for the alcohol and drug testing, he asked to speak with Lorick privately. During this private conversation, he told Lorick that he might test "hot" and had consumed "edibles" but not while he was at work. At the hearing, Rodriguez stated

that he had eaten a cookie laced with marijuana on the weekend before the accident, and that he had also used cocaine at a birthday party a couple of days prior to the accident. On the day of the accident, Rodriguez did not tell Lorick about his cocaine use. Lorick told Rodriguez that if he did not go for testing, he would be terminated.

¶ 14    When Rodriguez came to work on Monday, March 13, 2017, he told other employees that it might be his last day because of the accident. Lorick called Rodriguez into a conference room and instructed him to keep the potential ramifications of the accident private. Rodriguez apologized for what happened because it "was a regrettable situation." He told Lorick that his actions "a couple days prior" to the accident were "regrettable" and he had "dropped [his] guard" at a party. Lorick may have told him that the City had a process for seeking his termination and that the City had not yet received the drug test results.

¶ 15    Later that week, Rodriguez saw that he had a message from the testing lab on his phone. The lab called him again the next day, but he could not hear due to work activity. When he telephoned the lab later that day, a woman informed him that his test results were positive.

¶ 16    At the hearing, Rodriguez stated that he did not dispute the positive test results, but did challenge any interpretation of the results suggesting that he had used drugs within 24 hours of the test. He also again admitted that he used cocaine and marijuana in the days before the accident.

¶ 17    David J. Kuntz, Ph.D., testified as the City's toxicology expert. He had a master's degree and a Ph.D. in pharmaceutical sciences, worked as a forensic toxicologist since 1989, and was employed by Clinical Reference Laboratory ("CRL") since 2006. He was CRL's executive director

for analytical toxicology and co-laboratory director. His responsibilities included establishing the lab's standard operating procedures, maintaining those procedures, developing the analytical assays, and ensuring that the lab met all of the appropriate state and federal regulations. CRL's lab work focused on workplace drug testing. CRL has been continually certified as a federal drug testing laboratory since 1989.

¶ 18    Dr. Kuntz explained the different documents contained in CRL's laboratory data packet from the testing of Rodriguez's specimen, including the chain of custody records, initial screening results and confirmation results. Dr. Kuntz explained that CRL's forensic records administrator assembled the documents in the data packet after receiving a request for them. The packet contained an affidavit signed by Dr. Kuntz attesting that the attached records all related to the same specimen. His affidavit also attested that the records were created within CRL's regular course of business, reported by someone with knowledge at or near the time of the event, and exact duplicates of the originals.

¶ 19    When the City moved to admit the data packet, Rodriguez's counsel was allowed to *voir dire* Dr. Kuntz. During *voir dire*, Dr. Kuntz stated that about a dozen or more people would have had some association with the testing of the Rodriguez's sample. Although Dr. Kuntz could not remember each employee involved in the process, each of their names were listed in the data packet. Dr. Kuntz acknowledged that he was not involved in testing the sample but was in the lab constantly ensuring that people were performing their jobs as instructed.

¶ 20    Rodriguez objected to the admission of the testing reports, arguing that the records (1) were not made in the regular course of business but, rather, were medical records prepared in anticipation of litigation, and (2) did not meet the criteria for the admission of computer generated business records. The hearing officer overruled the objection, stating that CRL's business was the testing of specimens for the presence of illegal drugs, Dr. Kuntz specialized in the analysis of drugs, and the records were neither created in anticipation of litigation nor computer generated.

¶ 21    Dr. Kuntz then explained the process reflected in the lab records for ensuring that the chain of custody remained intact and that the tested specimen was Rodriguez's. Dr. Kuntz confirmed that, based on his review of the records, the chain of custody for Rodriguez's sample remained intact. He also explained that the records included the calibration controls for each of the sets of instruments and demonstrated that the instruments were properly calibrated and met the quality control requirements when the sample was tested.

¶ 22    Dr. Kuntz testified that Rodriguez's specimen tested above the City's cutoff limits for cocaine and marijuana. He explained that the applicable cutoff levels have been established for decades to ensure that the initial immunoassay tests were able to reliably detect the use of drugs, eliminate the casual unknowing ingestion incidents, and ensure that confirmation testing could reliably reproduce the results and eliminate the possibility of false positive tests. He explained that federal and state drug testing standards required the use of two different detection technologies: first, an immunoassay test and then confirmation by mass spectrometry. The immunoassay test used in this case was standard in the field of toxicology and reliable. The mass spectrometry test

that CRL used for confirmation testing was the most advanced technology available, was standard in the field of toxicology and reliable, and was "a DOT federally approved methodology."

¶ 23    Dr. Kuntz testified that the cutoff level for a positive test result was 150 nanograms for cocaine and 15 nanograms for marijuana. In Rodriguez's urine, the concentration of cocaine metabolite was 10,431 nanograms, and the concentration of marijuana metabolite was 46 nanograms. Dr. Kuntz opined that the presence of cocaine metabolite in a concentration above 10,000 nanograms indicated that Rodriguez had probably ingested cocaine within 24 to 48 hours before he provided his urine sample based on how quickly cocaine generally was metabolized and eliminated. Dr. Kuntz confirmed that the positive test results for cocaine and marijuana were accurately determined based on CRL's testing and the resulting documentation. Dr. Kuntz stated that the intoxicating effects of cocaine typically lasted only a couple of hours and positive urine test results for marijuana or cocaine did not indicate whether an individual was impaired at the time of the test. Dr. Kuntz tested "millions and millions of samples," found such testing "highly reliable" and had "no doubt that the drugs [we]re present in the sample."

¶ 24    Donald Bucklin, M.D., testified that he had been employed by U.S. HealthWorks for 19 years. He was U.S. HealthWorks' regional medical director and national medical review officer. He explained that a medical review officer was a doctor who was specially trained in the interpretation of drug screens. After reviewing a subject's results, a medical review officer will speak with the subject to determine if there was an alternative medical explanation for a positive result. After Dr. Bucklin received Rodriguez's positive test results, one of his employees called

Rodriguez and left a voicemail. Another employee subsequently called Rodriguez, who stated that he could not hear and would call back. When Rodriguez failed to call back, Dr. Bucklin reported the positive cocaine and marijuana test results to the City because there was no alternative medical explanation for the positive results.

¶ 25    Dr. Bucklin described the 10,431 nanograms of cocaine metabolite in Rodriguez's urine as "a very big number." He explained that, although urine testing cannot determine impairment, "we do know that cocaine is in and out of your system within 24 hours, so *** [Rodriguez] took a large amount of cocaine within 24 hours of the drug screen." Dr. Bucklin opined, that based on the large amount of cocaine metabolite, Rodriguez could have ingested either "a large amount two hours before the drug screen" or "the biggest amount any human being has ever taken 23 hours before the drug screen or anything in between those two brackets."

¶ 26    When the City moved to admit into evidence the medical review history that logged all contacts with Rodriguez and any related actions, the hearing officer allowed Rodriguez's counsel to *voir dire* Dr. Bucklin. During *voir dire*, Dr Bucklin explained that an entry in the history noting a request from the City for a "litigation packet" meant that the City contacted U.S. HealthWorks and requested all the documents related with this case. U.S. HealthWorks then sent that request to CRL. Dr. Bucklin also explained that U.S. HealthWorks used the term "litigation package" to refer to all the records from the lab associated with this case. He stated that not very many of the drug tests U.S. HealthWorks reviewed ended up in litigation; out of the 500,000 tests U.S. HealthWorks reviewed every year, probably only one test every three or four months resulted in litigation.

Dr. Bucklin testified that he was not personally involved in testing Rodriguez's sample and his testimony was limited to the medical review process, which he oversaw.

¶ 27    Rodriguez objected to the admission of the medical review history, arguing that the records (1) were not made in the regular course of business but, rather, were prepared in anticipation of litigation, and (2) did not meet the criteria for the admission of computer generated business records. The hearing officer overruled the objection, stating that the review history was not computer generated, it included the certifications and sign-offs of the individuals who were responsible for running the tests, and the testing was reliable because it used the gold standard of detection confirmation technology—mass spectrometry.

¶ 28    Dr. Bucklin concluded to a reasonable degree of medical certainty that this case was a verified positive test for both marijuana and cocaine. Although urine sample tests identify materials that have already passed out of the body, the tests still indicated the time frame at which the drug was taken. Because cocaine passes out of a person's system within 24 hours, Dr. Bucklin opined that "cocaine was consumed within 24 hours of the drug screen and a substantial number." When asked about Dr. Kuntz's testimony that cocaine could remain in the system for 24 to 48 hours, Dr. Bucklin responded: "It depends on who you talk to. You are not going to find anybody that says it's in and out in a week, but you could find some people that say 24 to 48 hours." Dr. Bucklin stated that the amount of cocaine metabolite in Rodriguez's urine "was in the upper 1% in terms of cocaine positives for the urine." Dr. Bucklin also opined that, if Rodriguez took the cocaine 48 hours before this drug screen, he would not be here because he would be dead due to

the very high level he had at the drug screening. Dr. Bucklin added that Rodriguez "could have taken a substantial amount two minutes before the drug screen" because the "farther you go back, the more needs to be taken to get a big number." Dr. Bucklin testified that he had never seen an employer testing policy that would allow for the amount of cocaine in Rodriguez's system because to "have a cutoff level for cocaine at 10,000 would be insane."

¶ 29    Shavone McKinley-Jenkins testified that she was the U.S. HealthWorks medical assistant who collected Rodriguez's urine specimen on March 10, 2017. She recalled Rodriguez because he was "a little like scared," was "asking a lot of questions and going back and forth on the phone with his lawyer about providing a specimen." Rodriguez's "[s]cared and nervous" behavior was not normal. McKinley-Jenkins explained the instructions she gave Rodriguez and the steps she took to ensure the proper chain of custody for his sample.

¶ 30    Officer Mark Mirabelli testified that he had served as a Chicago police officer for 22 years. In that role, he estimated that he dealt with hundreds of accidents each year and had to assess accident damage. During his career, he responded to "thousands" of accidents. He explained that, although he was not a trained professional in auto body and fender damage, he had "on-the-job experience." He also stated, "We're kind of told to guess because of the three different boxes on the police report." Regarding the accident at issue here, he testified that Stone's car had a little damage on the front quarter panel, and the City's van had "a smudge." Based on the damage to Stone's car, Officer Mirabelli checked the box in his report indicating the amount of damage was

between $500 and $1500. Officer Mirabelli testified that no personal injury occurred, both vehicles drove away and Rodriguez did not appear impaired.

¶ 31 When the City moved to admit the accident report into evidence, Rodriguez's counsel objected based on hearsay. The hearing officer overruled the objection, stating that the officer's testimony was admissible and he could testify about why he wrote the report the way he did.

¶ 32 Jose Chao testified that he was DCASE's director of facilities. His responsibilities included maintaining DCASE's vehicles, and he was one of Rodriguez's supervisors. Driving was a regular part of Rodriguez's job duties, and he was assigned to drive every day that week. Chao drove to the scene of the accident and observed the damage to the driver's side front fender of Stone's car. Chao also observed the damage to the City's vehicle. Two days after the accident, Chao took a photograph of the damage to the City's vehicle. The photograph depicted scratches or marks caused by the accident. Chao testified that he had experience repairing cars because he worked as a mechanic before joining the City and also repaired and modified his own vehicles. Days after the accident, Chao told Lorick by e-mail that "elbow grease" could remove the damage to the City's vehicle. The City did not ask Chao to attempt to remove the damage with "elbow grease," and the City had not repaired the vehicle as of the hearing. Chao explained that the City leased the vehicle and would eventually have to return it "in perfect condition." Chao stated that, if the damage could not be removed, the vehicle would need to be repainted, which would cost between $3000 and $5000. Chao testified that the accident left 5 to 6 feet of damage along the City vehicle from the rear passenger sliding door to the rear tire.

¶ 33    After the accident, Chao attended the meeting with Rodriquez, Trick and Lorick. Chao testified that Rodriguez said he had consumed cookies laced with marijuana the prior weekend. After the meeting, Chao and Trick took Rodriguez to the clinic for the drug and alcohol testing. They remained there for 2 1/2 or 3 hours because Rodriguez claimed to have difficulty producing urine for the test and kept drinking water. While there, Rodriguez made statements about testing positive.

¶ 34    Chao acknowledged that he told Lorick in a March 2017 e-mail that Stone's car sustained "superficial" damage to its bumper and "the paint on the bumper marred up from the center to the driver's side." Chao estimated that repairing that damage to perfect condition would cost between $750 and $1500. Chao also testified that he was aware that Rodriguez drove two other employees to the museum after the accident and that he later drove six employees back from the museum.

¶ 35    Lisa Lorick testified that she was DCASE's director of human resources. DCASE policy required that an employee must notify his supervisor of an accident and then that supervisor must notify Lorick. The employee then comes to Lorick's office to complete paperwork regarding the accident, and Lorick determines whether drug testing is required after assessing the accident documentation. The City's personnel rules allow drug testing if there is reasonable suspicion that an employee is under the influence of alcohol or drugs, if there is a fight, or if there is an accident resulting in serious injury or significant property damage. The term "significant property damage" meant damage of $500 or more. Lorick knew that $500 was the threshold amount from working for the City for 16 1/2 years and had learned of the $500 threshold during human resources

meetings. She also contacted the department of human resource's first deputy commissioner to confirm that amount. The $500 threshold for significant property damage was not written anywhere.

¶ 36     On March 10, 2017, Lorick received a telephone call informing her of the accident. She learned that Rodriguez's van contained 10 DCASE employees. Lorick was particularly concerned for the safety of one employee who was seven months pregnant. Lorick contacted Chao and instructed him to bring Rodriguez to her office.

¶ 37     Lorick met with Chao and Rodriguez in her office. Trick joined the meeting later. When Rodriguez and Chao arrived but before Lorick could even ask any questions, Rodriguez immediately said that the accident was the other driver's fault and started pacing back and forth. Lorick asked Rodriguez to start from the beginning and tell her exactly what happened, but he was not able to give a clear explanation from beginning to end. He repeatedly stated that there was minimal damage, just a "graze." Lorick tried to calm Rodriguez down, asked him to sit down, take a breath and explain from the beginning what actually happened, but his demeanor was somewhat erratic and he was not able to calmly and clearly explain what had happened. Lorick could not get a clear picture of what Rodriguez was trying to say. Instead of answering Lorick's question, Rodriguez would default to repeating the same three statements. Lorick thought that Rodriguez was stalling and being extremely evasive and confusing.

¶ 38     Lorick asked Rodriguez for the police report at the meeting, and Rodriguez said that he would provide it later. When Lorick asked about damage to either vehicle, Rodriguez responded

that the damage was very minimal, "just a graze, a scratch." At the time of the meeting, Lorick was not aware that Chao was at the accident scene and had seen the vehicles. Lorick told Rodriguez that he would have to go for drug and alcohol testing. When she presented the testing paperwork to Rodriguez, he asked to speak to her privately. During their private conversation, Rodriguez said that he did not want to go for the drug testing because it would result in a "hot drop," which he explained meant that the test result would be "dirty." Lorick understood that to mean that Rodriguez believed he would test positive. She told him that he had the choice whether or not to undergo testing but his refusal would be considered the same as a positive test result. Rodriguez then told Lorick that "he partied on Wednesday, a couple of days before he was to drive." When Lorick asked him why he came to work knowing that he had to drive DCASE employees around, he said he felt okay. Lorick and Rodriguez returned to her office, and Rodriguez signed the testing paperwork. Rodriguez then went for testing with his supervisors.

¶ 39    Lorick testified that Rodriguez's vagueness in describing the incident during their meeting prevented her from obtaining the necessary information to determine whether anyone involved in the accident sustained either an injury or significant property damage. Consequently, she indicated in the paperwork that the reason for ordering Rodriguez's alcohol and drug testing was "post-accident." However, she denied ordering Rodriguez's testing merely because he had been involved in an accident. Rather, Lorick sent him for testing based on what occurred at the meeting. She was also particularly concerned about the number of employees in the van at the time, especially a

seven-month pregnant employee, and whether injuries to those passengers might not be detected until sometime later.

¶ 40    On the morning of Monday, March 13, 2017, several employees approached Lorick and said that Rodriguez was telling everyone that he was going to be fired. Lorick went into a conference room with Rodriguez. Rodriguez "apologized that he was going to have a dirty drop, a hot drop, and that he thought that he was going to be fired that day and was saying his goodbyes." Lorick told him that it was a confidential human resources matter, there was a process that needed to be followed, and he needed to keep quiet. She also said that, as part of that process, he needed to provide her the requested paperwork, including the police report.

¶ 41    Lorick asked Rodriguez for the police report almost every day thereafter. Almost a week after the accident, Lorick sent Rodriguez an e-mail again reminding him about the police report. When Rodriguez eventually provided the report, it indicated a damage amount of $500 to $1500. Lorick later learned the full extent of the damage to the City's vehicle from photographs that Chao sent her. She also learned the extent of the damage to the other vehicle by speaking with Stone and receiving photographs of Stone's car. Stone also submitted a repair estimate from Maaco and told Lorick that the accident was the sole cause of damage to her car.

¶ 42    When the City moved to admit the Maaco estimate into evidence, Rodriguez objected based on lack of foundation, arguing that Lorick lacked knowledge about how the estimate was performed. Rodriguez also objected that there was no way to know if Stone's car was involved in subsequent accidents. The hearing officer overruled those objections, stating that the auto repair

estimate was sufficiently reliable for an administrative hearing, insurance companies commonly used such estimates when handling automobile accident claims, and a reasonable person would consider these estimates when determining the extent of the damage to an individual's car.

¶ 43 Rodriguez also objected to the Maaco employee's affidavit, which averred that Maaco's repair service created the estimate. Specifically, Rodriguez argued that the affiant was not available for cross-examination and the affidavit would not be admissible in an ordinary car accident case in the circuit court. The hearing officer overruled this objection, stating that this matter was an administrative hearing and not a property damage case in the circuit court. Lorick then testified that the Maaco estimate for the damage to Stone's car was $1531.53.

¶ 44 The hearing officer issued a report recommending that the Board uphold Rodriguez's termination. The Board agreed. The Board found that Rodriguez's admissions of illegal drug use established violations of personnel rule XVIII, section 1, subsections 14 (prohibiting possession or use of any controlled substance on or off the job), 15 (prohibiting unlawful conduct), 36 (requiring compliance with "laws or department rules governing health, safety, and sanitary conditions"), and 50 (prohibiting "[c]onduct unbecoming" a "public employee"). The Board further found that Rodriguez's positive drug test results established violations of subsections 14, 15, 36, 50, and 51 (which mandated the discharge of an employee who fails a drug test). The Board concluded that the positive urine testing did not prove that Rodriguez was impaired on the job and, therefore, did not establish a violation of subsection 24 (prohibiting "[r]eporting for work under the influence"). The Board also rejected Rodriguez's argument that Lorick lacked

evidence of significant property damage to order drug testing. The Board found that Rodriguez had withheld the accident report from Lorick at the time and that the report and the Maaco estimate ultimately showed that the accident in fact involved significant property damage.

¶ 45    Rodriguez filed in circuit court a combined complaint alleging federal civil rights violations and a petition for a common law writ of *certiorari*. The City removed the matter to federal district court. The district court granted summary judgment in favor of the City and against Rodriguez on the federal claim, holding that Rodriquez's drug test was constitutional because Lorick had probable cause to order his drug testing due to his admissions that he might test positive for drugs and that he had partied over the weekend. The district court dismissed the state-law *certiorari* claim without prejudice.

¶ 46    Rodriguez then filed a petition for a writ of *certiorari* in the circuit court. The court affirmed the Board's decision. Rodriguez timely appealed.

¶ 47                                  II. ANALYSIS

¶ 48                        A. Manifest Weight of the Evidence.

¶ 49    Rodriguez argues that the Board's findings were against the manifest weight of the evidence because (1) the City lacked the requisite evidence of significant property damage to send him to alcohol and drug testing after he was involved in a vehicle collision, and (2) the hearing officer improperly admitted into evidence the affidavit regarding Stone's car repair estimate, Officer Mirabelli's testimony regarding his estimate of the damage, and the drug testing laboratory report.

¶ 50 "A common law writ of *certiorari* is a general method for obtaining circuit court review of administrative actions when the act conferring power on the agency does not expressly adopt the Administrative Review Law and provides no other form of review." *Smith v. Department of Public Aid*, 67 Ill. 2d 529, 541 (1977). "The standards of review under a common law writ of *certiorari* are essentially the same as under the Administrative Review Law." *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996). The reviewing court will not overturn an agency's factual findings unless they are against the manifest weight of the evidence (*Wortham v. City of Chicago*, 2015 IL App (1st) 131735, ¶ 13), which means no rational trier of fact could have reached the conclusion of the agency (*Chief Judge of the Circuit Court of Cook County v. AFSCME, Council 31, AFL-CIO*, 153 Ill. 2d 508, 514 (1992)). It is not the court's role to resolve factual inconsistencies, make credibility determinations, weigh the evidence, and "determine where the preponderance of the evidence lies." *Launius v. Board of Fire & Police Commissioners*, 151 Ill. 2d 419, 427-28 (1992).

¶ 51 The Board found that Rodriguez's admitted drug use and positive drug test established multiple violations of the City's personnel rule XVIII, section 1, subsections 14, 15, 36, 50 and 51. Those subsections prohibited, respectively, "involvement in the illegal sale, delivery, receipt, possession or use of any controlled substance either on or off the job site during hours of employment or non-working time"; "any act or conduct prohibited by the Municipal Code of the City of Chicago, the Illinois Compiled Statutes, applicable laws of other states, or federal statutes"; "[f]ailing to comply, in carrying out any acts in the scope of employment, with laws or department rules governing health, safety, and sanitary conditions"; "[c]onduct unbecoming an officer or

public employee"; and "[v]iolating the City's drug and alcohol testing policy," which requires the initiation of a discharge action against any employee who tests positive for illegal drugs. In March 2017, possession of marijuana and cocaine was illegal. 720 ILCS 550/4 (West 2016); 720 ILCS 570/402 (West 2016).

¶ 52    According to Rodriguez's own testimony, he admitted to Lorick before his drug test that he would test "hot" and that he had consumed edible marijuana off-duty. Rodriguez further admitted at the hearing that he had eaten a cookie laced with marijuana on the weekend before the accident and used cocaine at a birthday party a couple of days prior to the accident. Rodriguez repeated those admissions multiple times. Those admissions plus his undisputed positive cocaine and marijuana drug test results amply supported the Board's findings that Rodriguez violated subsections 14, 15, 36, 50 and 51 of section 1 of personnel rule XVIII.

¶ 53    Rodriguez, however, argues that Lorick lacked evidence of significant property damage because she did not know the specific amount of property damage and thus had no basis to send him for post-accident drug and alcohol testing.

¶ 54    According to the record, Lorick did not have evidence of the damage because, when she asked Rodriguez about the accident, his vague description of the incident and nonresponsive answers to her questions prevented her from learning the extent of the damage. Rodriguez had received at the scene of the accident a copy of the accident report, which estimated the damage as between $500 and $1500. Lorick testified, however, that when she asked Rodriguez for a copy of the report after the accident, he did not give it to her. The Board stated that Rodriguez wrongfully

withheld the report and any acceptance of his delay in giving Lorick that report would allow him to control and subvert the City's drug and alcohol testing policies and procedures and reward him for deceitful misconduct.

¶ 55    Rodriguez argues that the Board could not make credibility determinations in the absence of input from the hearing officer because the Board did not hear the evidence or see the witnesses. The Illinois Supreme Court, however, has rejected the argument that Board members who did not observe witnesses cannot judge the credibility of those persons. *Abrahamson v. Illinois Department of Regulation*, 153 Ill. 2d 76, 95 (1992). Rather, "agency members making the final decision need not be present when the evidence is taken, so long as they review the record of proceedings." *Id*. Here, the Board expressly stated that its findings were based on the hearing officer's report and the transcript of the hearing.

¶ 56    Also, Rodriguez's reliance on *Hearne v. Chicago School Reform Board*, 322 Ill. App. 3d 467 (2001), to support his argument is misplaced. In *Hearne*, the court ruled that the Board failed to comply with procedural due process when it improperly rejected the hearing officer's credibility determinations regarding witnesses and substituted its own opposite determinations without any consultation with the hearing officer. *Id.* at 483. Here, in contrast, the Board's findings did not involve any rejection of the hearing officer's credibility determinations.

¶ 57    Rodriguez also argues that the City failed to comply with its personnel rules because the City failed to show, "as a prerequisite to sending an employee to drug testing," the occurrence of significant injury requiring medical attention or significant property damage. This argument lacks

merit. The plain language of the City's drug testing policy nowhere states anything about prerequisites or any showing before testing; rather, the policy provides that "[t]he City may require testing of any employee involved in an accident which results in significant injury requiring medical attention or significant property damage while at work, on City property or on City business." City personnel rule XIX. Furthermore, the evidence that Lorick gathered after the testing showed that the accident in fact resulted in significant property damage.

¶ 58    Rodriguez cites *Service v. Dulles*, 354 U.S. 363 (1957), where the government attempted to completely by-pass regulations pertaining to the investigation of employee misconduct prior to the employee's discharge. According to Rodriguez, *Service* supports his argument that the City and Board had no authority to fire him because the City failed to follow its rules regarding ordering him to undergo drug testing. Rodriguez's reliance on *Dulles* is unavailing. Rodriguez was not discharged without the benefit of the hearing to which he was entitled.

¶ 59    In *Cartwright v. Civil Service Commission*, 80 Ill. App. 3d 787, 792 (1980), this court stated that administrative agencies were not slaves to their rules and could deviate from those "when prompted by unique or emergency situations." Here, Lorick faced a unique situation with an employee who was involved in an accident while driving nine other employees, including a pregnant woman, on duty in a City vehicle. Lorick was concerned that someone may have been injured and that the injuries were not detected at the time of the accident. She also knew from Rodriguez that there had been contact between his vehicle and another car resulting in some damage, but she was unable to learn the full extent of the damage due to Rodriguez's evasive and

confusing answers to her questions. As the Board noted, Lorick also faced a ticking clock because "[t]he closer to the time of an accident a person is tested the more accurate the results." Furthermore, before the testing occurred, Rodriguez admitted to Lorick that he would test "hot" and that he had consumed "edibles" the prior weekend.

¶ 60    Rodriguez cites *In re Freddie Ramos*, 15 Human Resources Board (hereinafter, HRB) 002 (2015), for the proposition that the City had no basis to initiate drug and alcohol testing in the absence of significant damage. But in *Ramos*, the Board found that the City failed to present any evidence showing that Ramos's supervisors believed there had been significant accident damage or that the accident damage was in excess of $500. By contrast, here, Lorick testified that she was concerned there may have been significant property damage but Rodriguez thwarted her efforts to ascertain the extent of that damage, and the Board found that the evidence ultimately established that the damage was more than $500.

¶ 61    Rodriguez also cites *In re Patrick Mullaney*, 15 HRB 145 (2016), to argue that the personnel rules do not allow automatic drug testing after any accident.  But Lorick testified that she did not order Rodriguez's testing solely because he had been in an accident. Rather, she explained that she ordered testing based on her concerns about any injuries to the occupants of the involved vehicles and her inability to learn the extent of the damage due to Rodriguez's conduct during their meeting. Furthermore, *Mullaney* is distinguishable because the damage there was below $500 and an applicable collective bargaining agreement—and not simply the City's internal rules—contractually required significant damage for testing.

¶ 62    Rodriguez argues that the City improperly terminated his employment based on his violation of an unwritten policy that imposed a $500 threshold for significant property damage. Rodriguez, however, was not terminated for causing damage in excess of $500. Rather, the City terminated him for using illegal drugs in violation of written personnel rules. Thus, the cases cited by Rodriguez to support this argument are distinguishable because those cases involved employees who, unlike Rodriguez, were terminated for violating unwritten policies. See *Jackson v. Board of Education*, 2016 IL App (1st) 141388, ¶ 41 (finding no "evidence of any established rules or procedures for teachers and staff to report testing irregularities"); *Walker v. Dart*, 2015 IL App (1st) 140087, ¶ 51 (finding no policy "expressly prohibit[ing] the taking of prescription medication from a bottle that cannot be refilled"); *Kinsella v. Board of Education*, 2015 IL App (1st) 132694, ¶ 29 (finding no evidence of a zero-tolerance policy for alcohol use).

¶ 63    Rodriguez also argues that the Board improperly ignored the word "significant" in the phrase "significant property damage." To the contrary, the Board found, based on Lorick's testimony, that "there is no dispute that at the time of the accident, and still today, $500 is the threshold" used by the City to determine significant property damage.

¶ 64    Rodriguez also asserts that there was no evidence that either vehicle involved in the accident was ever repaired. This argument, however, is irrelevant under the City's personnel rules, which say nothing about any requirement of repairs. Furthermore, Chao's testimony established that, because the City leased the van involved in the accident, the City would have to return the van "in perfect condition."

¶ 65    Rodriguez argues that Chao informed Lorick that the damage to Stone's car was superficial and the harm to the City vehicle could be remedied with some elbow grease. However, Chao also testified that the City did ask him to repair the damage using elbow grease and if the damage could not be rubbed out then the van would need to be repainted at a cost between $3000 and $5000.

¶ 66    Rodriguez cites *In re Patrick Mullaney*, 15 HRB 145 (2016) where the Board held that a supervisor's understanding of what constituted significant property damage was not sufficient, by itself, to establish that $500 was the threshold amount for property damage to be deemed significant. In contrast, here, Lorick did not rely on her mere understanding that the threshold was $500; rather, she testified that this policy of the City's human resources department was relayed to her at meetings and confirmed to her by that department's first deputy commissioner.

¶ 67    Reasonable suspicion also supported Lorick's decision to order testing. The personnel rules allow "testing of an employee for whom there is a reasonable suspicion that the employee has used drugs or alcohol or is under the influence of drugs or alcohol while at work, on City property or on City business." City personnel rule XIX. The Board found that Rodriguez's pre-testing admissions to Lorick and Chao that he would likely fail a drug test because he had consumed edible marijuana provided reasonable suspicion.

¶ 68    Rodriguez does not dispute that reasonable suspicion existed to justify testing. Rather, he argues that reasonable suspicion is irrelevant because Lorick only marked "post-accident" as the reason for testing when she completed the testing form and did not indicate that reasonable suspicion was another basis to order testing. Rodriguez cites *Cartwright*, 80 Ill. App. 3d 787, for

- 25 -

the proposition that a government agency must be consistent and may not change theories at or after the disciplinary hearing." *Cartwright*, however, is not on point. There, the court reversed a termination because the employee was charged with failing to restrain subordinates from striking residents but was discharged for failing to reprimand another employee for using a chokehold. 80 Ill. App. 3d at 793. The court explained that this discrepancy failed to "reasonably apprise[ ] [the employee] of the charges so that he can intelligently prepare his defense." *Id*. By contrast, here, the fact that Lorick did not indicate on the testing form the basis of reasonable suspicion in no way affected the nature of the subsequent charges underlying Rodriguez's termination. The City charged Rodriguez with violating the rules prohibiting illegal drug use, and the Board sustained his termination on those same grounds. Moreover, Dr. Kuntz testified that, regardless the reason for the testing, CRL would have conducted the exact same tests on Rodriguez's sample.

¶ 69    Rodriguez also challenges the admission of the Maaco repair estimate and the accident report as evidence of the amount of damage caused by the accident. This court reviews an administrative hearing officer's decision to admit evidence for abuse of discretion. *Shachter v. City of Chicago*, 2016 IL App (1st) 150442, ¶ 31; see also *Palacios v. Mlot*, 2013 IL App (1st) 121416, ¶ 18 (an abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view). A reviewing court "may not interfere with an administrative body's discretionary authority unless that authority is exercised in an arbitrary or capricious manner." *Dombrowski v. City of Chicago*, 363 Ill. App. 3d 420, 426 (2005).

¶ 70    The hearing officer did not abuse his discretion in admitting the estimate or the report. The Board's rules allow the admission of evidence that is "material, relevant evidence, which would be relied upon by a reasonably prudent person in the conduct of serious affairs." The hearing officer explained that the Maaco repair estimate in the amount of $1531.53 met these standards because insurance companies regularly request that persons involved in accidents obtain and submit similar estimates and then rely on those estimates in processing claims. Accordingly, the hearing officer explained that "this is the kind of information that a reasonable person would take into consideration in determining the extent of the damage to an individual's car." The hearing officer also explained that he could admit the repair estimate despite Rodriguez's objection that he could not cross-examine the Maaco employee who swore an accompanying affidavit because, unlike in civil court trials, the Board's rules allow for the admission of hearsay evidence that is sufficiently reliable. The hearing officer overruled Rodriguez's hearsay objection to that testimony, and that was within his discretion to do because insurance adjusters regularly rely on similar submissions of damage estimates when assessing accident damage without any additional verification.

¶ 71    Rodriguez argues that, under Illinois law, hearsay evidence that does not allow an opportunity for cross-examination should not be admitted in administrative hearings. This court, however, has upheld the City's use of written documents to prove its case at administrative hearings where the other party has the ability to subpoena witnesses with knowledge of the documents but fails to do so. *Dombrowski*, 363 Ill. App. 3d at 427. The record establishes that

Rodriguez was aware of his right to subpoena witnesses. After the City rested its case without calling either the Maaco affiant or Stone, Rodriguez's counsel also rested his case without any efforts to procure their testimony, stating that he saw "no reason to present any additional witnesses." This court has recognized that the City is permitted to present its evidence of violations in the form of written reports where "respondents have the opportunity to cross-examine the reports' authors" but fail to invoke that right because respondents "cannot be deprived of a right they fail to exercise." *Id.*

¶ 72    Rodriguez asserts that the hearing officer improperly admitted Officer Mirabelli's speculative testimony that he estimated the accident damage to be between $500 and $1500. But Rodriguez did not object to Officer Mirabelli's testimony on the grounds of "guess" or speculation at the hearing, and objections that are not made during the course of the administrative hearing process are deemed forfeited. See *Cook County Board of Review v. Property Tax Appeal Board*, 395 Ill. App. 3d 776, 786 (2009). Forfeiture aside, the record establishes that Officer Mirabelli's testimony was not speculative or a mere guess. When asked about his training in evaluating accident damage, Officer Mirabelli responded that "[w]e're kind of told to guess because of the three different boxes on the police report. We're not body and fender people." But he also made clear that, although he was not a trained professional in accident damage, he had amassed on-the-job experience in his 22 years as a police officer who had responded to "thousands" of accidents and was required to assess damage caused by "hundreds" of accidents

each year. Based on that experience, the hearing officer did not abuse his discretion by considering Officer Mirabelli's testimony sufficiently reliable.

¶ 73    Rodriguez also asserts that the hearing officer improperly admitted the accident report, which generally are not admissible. The record shows that Officer Mirabelli testified about the damage he observed and estimated the accident damage between $500 and $1500 before he was even shown his report, and Rodriguez did not object to that testimony at the hearing. The hearing officer admitted the accident report because it contained the same information about which Officer Mirabelli had already testified. We conclude that Rodriguez cannot show prejudice by the admission of Mirabelli's police report because the same or similar information contained thereon was already received through his testimony. See *Jacobs v. Holley*, 3 Ill. App 3d 762, 764 (1972).

¶ 74    Rodriguez'a citation to *Patrick Mullaney*, 15 HRB 145 (2016), where the Board rejected a police accident report, is unavailing. In *Mullaney*, the Board explained that no testimony was offered regarding which police officer, if any, checked the vehicle or how the estimate was determined. By contrast, Officer Mirabelli appeared and testified about his damage estimate. Moreover, the report was relevant not for the truth of the matter asserted in its estimate but for the notice that it would have provided Lorick of the significant property damage if Rodriguez had given it to her. When offered for a purpose other than the truth of the matter asserted, an out of court statement is not hearsay by definition. See Ill. R. Evid. 801(c) (eff. Oct. 15, 2015).

¶ 75    Even assuming that the Maaco estimate or police report were improperly admitted into evidence, the record contains ample evidence to sustain the Board's finding of significant property

damage. On manifest weight review, that finding "must be sustained if any evidence fairly supports the determination of the administrative agency." *Discovery South Group, Ltd. v. Pollution Control Board*, 275 Ill. App. 3d 547, 552 (1995). The existence of sufficient other evidence is also a reason to reject Rodriguez's hearsay arguments. See, *Abrahamson*, 153 Ill. 2d at 94 (holding that the admission of hearsay evidence did not deny due process where the record contained competent evidence"). As discussed above, Officer Mirabelli independently testified that he estimated the damage on Stone's car to be between $500 and $1500. In addition, Chao testified about his experience repairing cars and estimated the cost to repaint the City's van at $3000 to $5000, and the cost to repair the other vehicle at $750 to $1500.

¶ 76     Rodriguez's objections to the admission of the testing records are meritless. At the hearing, he testified that he did not dispute his positive drug test results. On appeal he asserts two technical objections to the admission of those undisputed results. First, he argues that the hearing officer improperly admitted the testing results under the business records exception to the hearsay rule. The hearing officer, however, made clear that he had not admitted the results pursuant to the business records exception but, rather, because Dr. Kuntz properly laid the foundation for their admission through his testimony. The hearing officer also explained that the results would in any event qualify as business records because CRL's business was to test specimens for the presence of illegal drugs or substances. The hearing officer also properly rejected Rodriguez's assertion that the results did not meet the requirements for the business record exception because they were created in preparation for litigation. As the hearing officer explained, CRL created the testing

results long before any litigation existed between the parties and before the City had even terminated Rodriguez. Rodriguez's reliance on *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *People v. McClanahan*, 191 Ill. 2d 127 (2000), to assert that laboratory reports are not admissible as business records, is misplaced. Those cases are not applicable here because they involved laboratory reports created as part of a criminal investigation and in anticipation of prosecution.

¶ 77    Next, Rodriguez argues that the City failed to establish a proper foundation for the test results because Dr. Kuntz was not involved in processing Rodriguez's sample. However, Rodriguez did not raise this objection during the hearing and thus forfeited review of this issue. See *Cook County*, 395 Ill. App. 3d at 786. Forfeiture aside, the record establishes that Dr. Kuntz provided ample foundational testimony for the admission of the test results.

¶ 78    We conclude that the Board's findings that Rodriguez violated provisions of the City's personnel rule XVIII were not against the manifest weight of the evidence.

¶ 79                                  B. Discharge Sanction

¶ 80    Rodriguez argues that the Board's discharge sanction was not warranted because (1) there was no finding that he was under the influence of drugs or used or possessed illegal drugs while at work, and (2) the Board abused its discretion by interpreting certain terms in the City's personnel rules broadly and contrary to their commonly accepted meaning.

¶ 81    Cause for discharge exists when an employee exhibits "some substantial shortcoming" that renders "continuance in his office or employment in some way detrimental to the discipline and

efficiency of the service and something which the law and a sound public opinion recognize as a good cause" for discharge. (Internal quotation marks omitted.) *Launius*, 151 Ill. 2d at 435. The Board's "cause finding is to be respected by th[e] court[s] and it should be overturned only if it is arbitrary and unreasonable or unrelated to the requirements of the service." (Internal quotation marks omitted.) *Id.* Deference is appropriate because "[i]t is the Board, rather than the court, which is best able to determine the effect of the [employee's] conduct on the proper operation of the department." *Kappel v. Police Board*, 220 Ill. App. 3d 580, 590 (1991).

¶ 82    The Board found that Rodriguez's admitted violations of the City's rules prohibiting illegal drug use and his positive drug test for cocaine and marijuana warranted discharge. That decision was not arbitrary, capricious, or unrelated to the requirements of Rodriguez's service. Indeed, the City's personnel rules mandate discharge of an employee who fails a drug test.

¶ 83    Contrary to Rodriguez's assertions on appeal, the City was not required to prove that he reported for work under the influence of drugs or used or possessed illegal drugs while on duty. Nevertheless, by Rodriguez's own account, he consumed cocaine at a party on a Wednesday night, in the middle of a work week in which he was assigned to drive other employees every day. Moreover, although the City's experts testified that urine testing does not reveal whether a subject was impaired at the time of testing, Dr. Bucklin testified that Rodriguez's post-accident urine sample "was in the upper 1 percent in terms of cocaine positives," and disputed Rodriguez's claim to have consumed cocaine at a party two days before the accident because "[i]f he took it 48 hours

before this drug screen, he wouldn't be here because he would be dead because he had a very high level *** at the drug screening."

¶ 84    Rodriguez also complains that the City did not allege that he was at fault in the accident. But fault in the accident was also irrelevant to any of the charges that the Board sustained. Rodriguez also asserts that discharge is not warranted for off-duty drug use because it is a harsh discipline that would impose a serious deprivation upon him. The Illinois Supreme Court made clear that a reviewing court may not second-guess a discharge order merely because it believes a less harsh penalty would be more appropriate. *Launius*, 151 Ill. 2d at 435-36; accord, *Siwek v. Police Board*, 374 Ill. App. 3d 735, 738 (2007); *Krocka v. Police Board*, 327 Ill. App. 3d 36, 48 (2001). Moreover, "the fact that different individuals have been disciplined differently is not a basis for concluding that an agency's disciplinary decision is unreasonable." *Siwek*, 374 Ill. App. 3d at 738.

¶ 85    Rodriguez also cites *Garrido v. Cook County Sheriff's Merit Board*, 349 Ill. App. 3d 68 (2004), to assert that application of the City's policies without evidence of on-the-job impairment violates substantive due process. But Rodriguez's case, in which he admitted his repeated, knowing use of multiple illegal drugs, is distinguished from *Garrido*, where the discharged employee presented undisputed evidence that she did not knowingly consume illegal drugs while under medical care in a foreign country. *Id*. at 80.

¶ 86    Rodriguez also asserts that his termination pursuant to the City's post-accident testing policy runs afoul of *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), because the undefined term

"significant property damage" leaves unclear the threshold level of risk to persons affected by the enactment. But unlike *Dimaya*, Rodriguez's case does not involve a criminal statute or penalty subjecting an immigrant to removal from the country, which requires "the most exacting vagueness" scrutiny. See *id.* at 1212-13. *Dimaya* also recognized that "[m]any perfectly constitutional statutes use imprecise terms like 'serious potential risk' *** or 'substantial risk.' " *Id.* at 1214. The Court struck down the statute in *Dimaya* not because it contained an imprecise term but because it further required a court to apply that imprecise term "to 'a judge-imagined abstraction'—*i.e.*, 'an idealized ordinary case of the crime.' " *Id.* at 1215-16. The City's post-accident testing policy contains no such double imprecision problem.

¶ 87    Moreover, the City did not discharge Rodriguez for causing significant property damage, but rather for drug use. He does not contest that he received fair notice of the conduct the drug use policy proscribed. Rodriguez also cites *Krebs v. Thompson*, 387 Ill. 471 (1944), to argue that the government must define what conduct is sanctionable and what is not. But *Krebs* faulted a statute that failed to identify the activities to which it was directed and left it to ministerial officers applying the statute to make that determination. *Id.* at 483. By contrast, the City discharged Rodriguez for violating clearly defined rules prohibiting illegal drug use by City employees.

¶ 88    We conclude that the Board's discharge decision was not arbitrary, unreasonable or unrelated to the requirement of Rodriguez's job.

¶ 89                                    III. CONCLUSION

¶ 90     For the foregoing reasons, we affirm the judgment of the circuit court that affirmed the Board's decision to discharge Rodriguez based on findings that he violated provisions of a personnel rule when he tested positive for cocaine and marijuana and admitted to using drugs illegally.

¶ 91     Affirmed.